Jeff R. Sykes, ISBN 5058
Michael A. Pope, ISBN 6267
**McCONNELL WAGNER SYKES & STACEY** [PLLC]
827 East Park Boulevard, Suite 201
Boise, Idaho 83712
Telephone:  208.489.0100
Facsimile:  208.489.0110
sykes@mwsslawyers.com
pope@mwsslawyers.com

Attorneys For Plaintiffs Charles M. LaKamp and Marianne LaKamp

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **CHARLES M. LaKAMP** and **MARIANNE LaKAMP,** husband and wife, <br><br> Plaintiffs, <br><br> vs. <br><br> **JOHN L. RUNFT,** an individual; **JOHN CRIGLER,** an individual; **JOHN MALLETTA,** an individual; **CWT, LLC,** an Idaho limited liability company; **IRWS LLC,** an Idaho limited liability company; **DORFKRÜG INTERNATIONAL, INC.,** an Idaho corporation; **SIMCO VENTURE FUND, LLC,** an Idaho limited liability company; **RUNFT & STEELE LAW OFFICES,** [PLLC,] an Idaho professional limited liability company; and **DOES 1** through **50**, inclusive, <br><br> Defendants. | **Case No. 1:20-cv-544** <br><br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

**COMES NOW,** Plaintiffs Charles M. LaKamp and Marianne LaKamp (collectively, "Plaintiffs"), by and through their counsel of record, McConnell Wagner Sykes & Stacey PLLC, and for a cause of action against Defendants John L. Runft; John Crigler; John Malletta; CWT, LLC; IRWS LLC; DorfKrüg International, Inc.; Simco Venture Fund, LLC; Runft & Steele Law Offices, PLLC; and DOES 1 through 50, inclusive (collectively, "Defendants"), allege as follows:

<u>**PREFACE**</u>

1.      By this action, Plaintiffs seek to recover a minimum of $250,000.00 that they invested with Defendants ostensibly to purchase and subsequently operate a landfill and recycling business.  This substantial investment by these private individuals was induced by fraudulent and misleading statements made by the principals of the corporate Defendants named herein who failed to reveal the precarious nature of the venture and their own breaches of the purchase and sale agreement with the owner of the landfill.  When inquiries were made regarding disposition and return of the $250,000.00, promises were made to return the money but no funds have been returned.

2.      The conduct alleged in this Complaint constitutes fraud, *Consumer Protection Act* violations, intentional infliction of emotional distress, unjust enrichment, violations of Federal and Idaho securities law, attorney malpractice and breaches of fiduciary duty.  Plaintiffs also seek declaratory judgment.

*/ / / /*
*/ / / /*
*/ / / /*
*/ / / /*

## PARTIES

3.      At all times material hereto, Plaintiffs Charles M. LaKamp ("Mr. LaKamp") and Marianne LaKamp ("Mrs. LaKamp") are husband and wife, and are citizens residing in the County of Tuolumne, State of California.

4.      On information and belief, Defendant John L. Runft ("Runft") is an individual residing in the County of Ada, State of Idaho, and an attorney licensed in Idaho to practice law.

5.      On information and belief, Defendant John Crigler ("Crigler") is an individual residing in the County of Ada, State of Idaho.

6.      On information and belief, Defendant John Malletta ("Malletta") is an individual residing in the City of Boise, County of Ada, State of Idaho.

7.      On information and belief, Defendant CWT, LLC ("CWT") was and is a limited liability company organized and existing under the laws of the State of Idaho, with its principal place of business in the City of Boise, County of Ada, State of Idaho.

8.      On information and belief, Defendant IRWS LLC ("IRWS") was and is a limited liability company organized and existing under the laws of the State of Idaho, with its principal place of business in the City of Boise, County of Ada, State of Idaho.

9.      On information and belief, Defendant DorfKrüg International, Inc. ("DKI") is an Idaho corporation in good standing with its principal place of business in the City of Boise, County of Ada, State of Idaho.

10.      On information and belief, Defendant Simco Venture Fund, LLC ("Simco") was and is a limited liability company organized and existing under the laws of the State of Idaho, with its principal place of business in the City of Boise, County of Ada, State of Idaho.

11.     On information and belief, Defendant Runft & Steele Law Offices, PLLC ("R&S") was and is a professional limited liability company organized and existing under the laws of the State of Idaho, with its principal place of business in the City of Boise, County of Ada, State of Idaho.

12.     Plaintiffs are informed and believe and, based thereon, allege that each of the Defendants is, and at all times herein mentioned was, the agent, servant and/or employee of each of the remaining Defendants, and each of the acts or failures to act of each of the Defendants as herein alleged was within the course and scope of each Defendant's authority as such agent, servant and/or employee, with the permission, consent, knowledge, prior authorization and subsequent ratification of each of the remaining Defendants.

## JURISDICTION AND VENUE

13.     The federal court has original jurisdiction of this case under 28 U.S.C. § 1332 (diversity).  Plaintiffs are citizens of the State of California and Defendants are citizens of the State of Idaho.  The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

14.     This Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337.  Plaintiffs' claims arise under Section 10(b) and 20(a) of the *Exchange Act* (15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated by the Securities and Exchange Commission ["SEC"] (17 C.F.R. 240.10b-5)) and §§ 12 and 17 of the *Securities Act of 1933* (15 U.S.C. §§ 77l and 77q).

15.     This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367(a) because they are related to claims within this Court's original jurisdiction, such that they form part of the same case or controversy under Article III.

16.     Venue is proper in the District of Idaho under § 27 of the *Exchange Act* and 28 U.S.C. § 1391(a), in that a substantial part of the events or omissions giving rise to the alleged claims took place in the City of Boise, County of Ada, State of Idaho, where all of the Defendants reside.

17.     Venue is also proper because many of the acts giving rise to the violations of which Plaintiffs complain took place in the District of Idaho, and Runft, Crigler and Malletta (collectively, "Individual Defendants") and CWT, IRWS, DKI and Simco (collectively, "Corporate Defendants") used the instrumentalities of interstate commerce, including wire, telephone communication and mail in connection with the sale of unregistered securities in the District of Idaho; the purchase of the unregistered securities were solicited from the District of Idaho; and, Plaintiffs sent payments for those unregistered securities into the District of Idaho.

18.     In connection with the acts alleged, the Individual Defendants and the Corporate Defendants  (sometimes,  collectively,  "Individual/Corporate  Defendants"), directly and/or indirectly, used the means of instrumentalities of interstate commerce, including, but not limited to, the mail and interstate wire and telephone communications.

////
////
////
////
////
////
////

## THE INDIVIDUAL DEFENDANTS ARE THE
## ALTER-EGOS OF THE CORPORATE DEFENDANTS

19.     Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

20.     There exists, and at all relevant times has existed, a unity of interest and ownership between the Individual Defendants, on one hand, and the Corporate Defendants, on the other, such that individuality and separateness between the Individual Defendants and the Corporate Defendants has ceased.  As a consequence, the Individual Defendants are the alter-ego of the Corporate Defendants.

21.     Adherence to the fiction of the separate existence of the Corporate Defendants as entities distinct from the Individual Defendants would permit an abuse of the corporate privilege and would promote injustice in that the Individual Defendants' acts led Plaintiffs to deal with inadequately financed corporate entities.

22.     The Corporate Defendants are, and all relevant times were, mere shells or shams without adequate capital or assets and were conceived, intended and used by the Individual Defendants as a device to avoid individual liability and for the purpose of substituting financially insolvent entities in their places.

23.     The Corporate Defendants are, and at all relevant times were, so inadequately capitalized that, compared with the business they claim to have done and the risks of loss, any capitalization was illusory.

24.     Plaintiffs are informed and believe that the Corporate Defendants had few, if any, assets or capital in their name and the Individual Defendants contributed little, if any, capital into any account held by the Corporate Defendants.

25.     The Corporate Defendants were not going-concerns or viable and valid business entities.  In reality, they were merely shells, instrumentalities or conduits through which the Individual Defendants carried out the fraudulent scheme described herein.

26.     Plaintiffs are informed and believe that the Corporate Defendants did not maintain adequate corporate records.

27.     The lack of separateness between the Individual Defendants and the Corporate Defendants, and the Individual Defendants' control and domination of the Corporate Defendants is further underscored by the fact that the Corporate Defendants had no separate offices of their own.

28.     Plaintiffs are informed and believe that the Corporate Defendants are mere shells and instrumentalities through which the Individual Defendants conducted business and carried out the fraudulent scheme described herein; that the Individual Defendants are the alter-egos of the Corporate Defendants; and, that fraud and injustice can only be avoided by disregarding the separate existence of the Corporate Defendants.

## **FACTUAL BACKGROUND**

29.     Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

30.     Non-party Idaho Waste Systems, Inc. ("Idaho Waste "), an Idaho corporation, owns and operates a commercially licensed solid waste landfill near the City of Mayfield, County of Elmore, State of Idaho ("Facility").

31.     CWT was formed on or about July 9, 2018.

32.     Runft is designated as the *Registered Agent* of CWT.

33.     CWT's business address is identified as 1020 West Main Street, Suite 420, Boise, Idaho 83702—the same address as R&S.

34.     CWT has not registered with the SEC or the Idaho securities authority, and CWT has not filed a *Notice of Exempt Offering of Securities* ("NEOS").

35.     CWT entered into a contract with Idaho Waste to acquire the Facility ("CWT/Idaho Waste Contract").   *See* Exhibit 1, Declaration of Jack R. Yarbrough filed June 22, 2020 ("Yarbrough Dec.") in that certain lawsuit venued in the Fourth Judicial District of the State of Idaho, in and for the County of Elmore, Case No. CV20-20-125, and styled as *CWT, LLC vs. Idaho Waste Services, Inc.*, *et al*.

36.     The CWT/Idaho Waste Contract required that CWT close escrow on acquisition of the Facility by March 4, 2019.  *Id*.

37.     CWT breached the CWT/Idaho Waste Contract when it failed to close escrow by March 4, 2019.  *Id*.

38.     After CWT had already breached the CWT/Idaho Waste Contract, CWT and Idaho Waste negotiated a contract addendum extending the close of escrow on the acquisition of the Facility to September 27, 2019.  *Id*.

39.     CWT breached the CWT/Idaho Waste Contract, as amended, a second time when it failed to close escrow on the acquisition of the Facility by September 27, 2019.  *Id.*

40.     IRWS was formed on or about December 12, 2018.  At the time of its organization, its principal place of business was designated as 13095 North Andys Gulch, Boise, Idaho 83714, which is a single family residence—not a commercial property—believed to be the home of Malletta (at least as of December 12, 2018).

41.     The principal place of business of IRWS is currently designated as the same address of its *Registered Agent*, Anne C. Kunkel, Esq., an attorney with the law firm of Varin Wardwell LLC, 242 8th Street, Suite 220, Boise, Idaho 83702-5892.

42.     Malletta and non-party Jeff Thompson were the named governors of IRWS at the time of IRWS's formation.

43.     Runft is also a governor/member of IRWS.

44.     On or about January 28, 2019, IRWS filed a NOES with the SEC, claiming exemption pursuant to SEC Rule 506(c).

45.     CWT has agreed to substitute IRWS as the purchaser of the Facility under the CWT/Idaho Waste Contract.

46.     On information and belief, each of the Individual Defendants is a principal of both CWT and IRWS.

47.     In conjunction with acquisition of the Facility, CWT/IRWS planned to engage in the business of recycling tires ("Project").

48.     CWT claimed to have a licensing agreements with non-party Second Life Recycling, LLC, an Idaho limited liability company, doing business as *2xRecycling* ("2xRecycling"), a tire processing company with its base of operations less than 3 miles from the Facility.  IRWS is the Manager of 2xRecycling.

49.     2xRecycling is the owner of an alleged proprietary coating called *VOC ProShield*™ ("VOC ProShield"), which CWT and/or IRWS represented would provide them a "market disrupting edge that will revolutionize products made from recycled tire material."

50.     CWT represented that it would sell its licensing rights for VOC ProShield to IRWS, making IRWS the ultimate entity in charge of the Project.

51.     Runft and Mr. LaKamp are acquaintances from high school who reconnected in July 2019 at a social event.

52.     At the time Runft and Mr. LaKamp reconnected in the summer of 2019, Plaintiffs needed legal representation in Idaho.

53.     Runft offered Plaintiffs the services of R&S.

54.     Plaintiffs agreed to hire R&S, consulting with Runft's partner, Jon Steele, and entered into the *Engagement Letter For Legal Services* dated September 18, 2019 ("Legal Services Agreement").  *See* Exhibit 2.

55.     During the course of telephone and email communications between Plaintiffs and Runft in or about August 2019, Runft solicited from Plaintiffs their investment in the acquisition of the Facility and development of the Project.

56.     Runft presented himself to Plaintiffs as a principal of both IRWS and DKI.

57.     Runft introduced Plaintiffs to Crigler and Malletta.

58.     Through the course of Plaintiffs' communications with the Individual Defendants, the Individual Defendants represented to Plaintiffs that their funds would be used "to assist IRWS in the acquisition of an operating asset and other related business interests" [*see* Exhibit 3] and the Individual Defendants specifically represented that:

a.     The Corporate Defendants had the financial wherewithal to fulfill the requirements of the CWT/Idaho Waste Contract;

b.     Defendants had secured financing for acquisition of the Facility and financing of the Project;

c.     The Individual Defendants had invested substantial sums of their own money into acquisition of the Facility and development of the Project;

d.     Defendants had also secured the commitment of Twelve Clans, Inc., a Section 17 corporation of the Ho-Chunk Nation, a federally recognized Indian Tribe organized

pursuant to the *Indian Reorganization Act of 1934* ("12 Clans"), to invest several million dollars into acquisition of the Facility and development of the Project;

   e. Defendants had the ability to fund and implement the Project;

   f. The initial $50,000.00 investment was needed to acquire equipment to unload entire rail cars of used tires for recycling at the Facility; and

   g. Plaintiffs would receive a return on their investment.

 59. Defendants provided no cautionary language, qualifications or conditions with their representations to Plaintiffs.

 60. As Plaintiffs later discovered, these representations were false and Defendants knew, or should have known the representations were false at the time they were made. For example, as explained in more detail below, in March 2019 CWT had already breached the CWT/Idaho Waste Contract, and CWT knew it did not have the funding source in August 2019 or September 2019 to close the CWT/Idaho Waste Contract for acquisition of the Facility.

 61. Plaintiffs trusted and reasonably relied upon Runft and the other Individual Defendants because of Runft's representations regarding his investment expertise and experience, and the attorney-client relationship between the R&S and Plaintiffs.

 62. In addition to the affirmative misrepresentations, Defendants also failed to disclose material information to which Plaintiffs were entitled.

 63. The Individual Defendants did not disclose to Plaintiffs that CWT had breached the CWT/Idaho Waste Contract when it failed to timely close in March 2019 for acquisition of the Facility, as the CWT/Idaho Waste Contract originally provided.

 64. The Individual Defendants did not disclose to Plaintiffs that CWT was again in breach of the CWT/Idaho Waste Contract as of September 27, 2019.

65.     The Individual Defendants did not disclose to Plaintiffs the nature or extent of their respective ownership interests, involvement or personal investments in CWT or IRWS.

66.     Runft did not advise Plaintiffs to seek independent counsel before making their investment.

67.     Runft did not present Plaintiffs with a conflict waiver and did not even suggest that one may be necessary until after Plaintiffs' investment had been made.

68.     The Individual Defendants originally negotiated for Plaintiffs to invest $2,000,000.00.

69.     During the August 2019 negotiations regarding Plaintiffs' investment, Plaintiffs received no documentation such as stock certificates, bylaws or operating agreement and, indeed, it was unclear in which entity or entities they would have an interest or where their funds were being invested; how their funds were to be used other than the false assertion that $50,000.00 was to be used to acquire railcar unloading equipment; or, any specifics on how they were to receive a return on their investment.

70.     In justifiable reliance upon Defendants' misrepresentations and Defendants' omissions of material facts, Plaintiffs agreed to invest with the Individual/Corporate Defendants.

71.     On September 9, 2019, Runft contacted Plaintiffs to confirm they were investing $250,000.00 for a "1.25% ownership at final closing" and promising to provide "the appropriate documentation." *See* Exhibit 4.

72.     On September 10, 2019, Plaintiffs wire transferred $50,000.00 to the R&S trust account. *See* Exhibit 5.

73.     On or about September 24, 2019, the Individual Defendants presented Plaintiffs with a *Memorandum of Understanding* ("MOU").  *See* Exhibit 3.  Notably, the MOU is unsigned by 12 Clans, the investor which the Individual/Corporate Defendants represented would be participating in the venture along with Plaintiffs.

74.     Again, in presenting the MOU, the Individual/Corporate Defendants at no time disclosed that the CWT/Idaho Waste Contract had initially expired on March 4, 2019, and was set to again expire on September 27, 2019.

75.     As described in the MOU, by September 24, 2019, Plaintiffs had reconsidered investing $2,000,000.00, but were still committed to investing $250,000.00.  *Id.*

76.     As further described in the MOU, the Individual/Corporate Defendants represented that 12 Clans was also going to invest a substantial sum in the acquisition of the Facility and development of the Project.  *Id*.

77.     On information and belief, 12 Clans was never a viable investor and Defendants' representation of it as such was false.  The facts upon which Plaintiffs base this claim are that 12 Clans did not sign the MOU and no further mention was made of 12 Clans subsequent to the presentation of the MOU or after Plaintiffs funded their $250,000.00 investment.

78.     The MOU, for the first time, references the formation of a new "single purpose entity"—*i.e*., Simco.  *Id*.

79.     The purpose of Simco is described in the MOU as "investing into IRWS" to "assist IRWS in the acquisition of an operating asset and other related business interests."  *Id.*

80.     Simco was formed on September 25, 2019—some 15 days after Plaintiffs' initial investment of $50,000.00.

81.     Again, Runft is the *Registered Agent* for Simco and the principal place of business listed for Simco is the R&S office at 1020 West Main Street, Suite 420, Boise, Idaho 83702.

82.     Simco has not registered with the SEC or the Idaho securities authority, and Simco has not filed a NOES.

83.     On October 7, 2019, Plaintiffs wire transferred $200,000.00 to the R&S trust account.  *See* Exhibit 6.

84.     On October 12, 2019, Runft contacted Plaintiffs acknowledging receipt of the $200,000.00 wire transfer and representing that they were "getting near on closing the landfill transaction."   This representation that the "landfill transaction" was nearing its close was false.  *See* Exhibit 7.

85.     On information and belief, the $250,000.00 that Plaintiffs wired to the R&S trust account is the only investment in Simco to date.

86.     The "landfill transaction" was not near its close on October 12, 2019. To the contrary, as described in the Yarbrough Dec. [Ex. 1], Jack Yarbrough, the owner of Idaho Waste, stated that the Individual/Corporate Defendants had strung along Idaho Waste for months and continued to do so with no concrete prospect of being able to come up with the funding necessary to close the acquisition of the Facility.

87.     Miraculously, on information and belief, the transaction closed on or about August 1, 2020, but Plaintiffs have yet to see any return on their $250,000.00 investment or any evidence of their ownership interest in the Facility.   Indeed, on information and belief, Plaintiffs were not disclosed as principals of the purchaser in the paperwork submitted to the project lender, Columbia Bank, when the loan commitment was made.  Thus, Defendants apparently concealed Plaintiffs' membership interest in Simco and/or IRWS from Columbia Bank

during the loan underwriting process, perhaps fearing that if Columbia Bank discovered the nature of Plaintiffs' claims, as outlined herein, then Columbia Bank would not have made the purchase loan.

88.     DKI was formed on December 23, 2015.  Runft is the *Registered Agent* for DKI and the principal place of business listed for DKI is the R&S office at <u>1020 West Main Street, Suite 420, Boise, Idaho 83702</u>.

89.     Runft is listed as one of the initial members of the DKI board of directors.

90.     Crigler and Runft are both represented to be principals of DKI on the DKI website.

91.     DKI's website reflects that it is an entity designed "to provide integrated solutions for today's complex business issues."

92.     Since June 2020, Plaintiffs have repeatedly requested a trust accounting from R&S for their $250,000.00.  All requests have been rebuffed, until recently when John W.Tulac—not a member of R&S—sent to Plaintiffs a record of where the funds were allegedly spent.

93.     Runft has represented that all of Plaintiffs' money went from the R&S trust account to DKI and, even though Runft is a principal of DKI, he continues to refuse to provide an accounting of how Plaintiffs' funds were allocated or spent.

94.     From October 2019 until July 2020, Defendants continued to provide Plaintiffs with verbal and written assurances that the transaction to acquire the Facility was on track and scheduled to close.

95.     As time went on and Plaintiffs received no documents and the acquisition of the Facility did not come to fruition, Plaintiffs grew suspicious of the transaction in which they had invested.

96.     Once Plaintiffs got suspicious and started looking into the backgrounds of Defendants, they found that Runft has a history of multiple judgments against him, some remaining unpaid for decades, along with IRS tax liens and an Idaho State tax lien. These findings revealed that, far from having the financial wherewithal to which he held himself to have, the truth was that Runft did not pay his taxes or satisfy judgments entered against him.

97.     Plaintiffs further discovered that Crigler has a history of Chapter 7 bankruptcies and adverse judgments against him.

98.     Runft conceded in early 2020 that he should have had a signed a waiver of conflict and informed consent agreement with Plaintiffs and promised to draft one but, to date, has failed to do so.

99.     In late January 2020, Runft provided a document titled *Short Synopsis on History, Simple Agenda, Goals & Next Steps, Referenced Documents*.  *See* Exhibit 8.  Rather than helping to explain things, the document raised even more questions; thus, on February 10, 2020, Plaintiffs' Nevada counsel, J. D. Sullivan, sent an email to Runft that included a memo ("February 10, 2020 Memo") requesting information regarding Defendants' companies and the structure of the investment.  *See* Exhibit 9.

100.     On February 11, 2020, Runft promised to provide answers "this week end" to the questions set forth in the February 10, 2020 Memo.  *See* Exhibit 10.  The answers were not forthcoming.

101.     On March 12, 2020, Plaintiffs sent to Runft a "Request for $250,000 Refund – Due 3/27/20."  *See* Exhibit 11.

102.     On March 16, 2020, Runft sent the email attached hereto as <u>Exhibit 12</u>.  Included in the March 16, 2020 email chain was an email forwarded from Crigler along with Crigler's response to the February 10, 2020 Memo.  This email and its attachments amounted to a circuitous and evasive response from Crigler and Runft.  On the one hand, Runft indicated that Crigler's response was "meant to address some of the[] matters in your" February 10, 2020 Memo but, at the same time as to multiple points, Crigler pointed Plaintiffs back to Runft.  *See* <u>Exhibit 13</u>, p. 3—"JC's" interlineated responses to the questions posed in the February 10, 2020 Memo.

103.     Of note, Crigler's response to the final question of "[h]ow exactly will the LaKamp's receive a return on their investment?" was "[t]he LaKamp's [sic] will receive a return based on distributions and relative to their participation within Simco."  *See* <u>Exhibit 13</u>.  Yet, as of the date of Crigler's response, an operating agreement had not been prepared confirming the organizational structure and members of Simco but, instead, was still being negotiated.  *See* <u>Exhibit 14</u>—*Operating Agreement* of Simco Venture Fund, LLC (02.28.20 draft); <u>Exhibit 15</u>—*Equity Investment Agreement* (v3.a_draft).

104.     Defendants have never produced any of the documentation requested by Plaintiffs.

105.     Defendants need to be held accountable for misleading Plaintiffs into investing the $250,000.00.

## THE SALE AND PURCHASE OF
## UNREGISTERED SECURITIES

106.     Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

107.     Defendants solicited Plaintiffs to purchase—and sold to them—unregistered securities in Simco.

108.   In soliciting Plaintiffs to purchase securities in Simco and selling Plaintiffs securities in Simco, Defendants used the instrumentalities of interstate commerce, including telephone, email and wire transfers.

109.   Plaintiffs have paid Defendants $250,000.00 in connection with their purchase of the securities of Simco.

110.   Plaintiffs are informed and believe that the Individual Defendants acted as control persons within the meaning of § 20(a) of the *Exchange Act*, as further described below.

### THE MATERIAL MISREPRESENTATIONS, NON-DISCLOSURES AND SCIENTER

111.   Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

112.   In connection with the purchase and sale of unregistered securities, the Individual/ Corporate Defendants made material misrepresentations of fact and failed to disclose material facts, disclosure of which was necessary to make what they stated not false and misleading.

113.   Specifically, the Individual/Corporate Defendants falsely represented that they intended to use Plaintiffs' funds for acquisition of the Facility and development of the Project.

114.   In order to induce Plaintiffs to purchase the unregistered securities, the Individual/ Corporate Defendants falsely represented that Plaintiffs would receive a substantial return on their investment due to new tire processing technology which would make them all rich.

115.   To further induce Plaintiffs to purchase unregistered securities, the Individual Defendants falsely represented that they had personally invested their own money.

116.    To further induce Plaintiffs to purchase unregistered securities, the Individual/ Corporate Defendants falsely represented that they had a viable lender ready, willing and able to loan the funds necessary to close the acquisition of the Facility in accordance with the CWT/Idaho Waste Contract.

117.    To further induce Plaintiffs to purchase unregistered securities, the Individual Defendants falsely represented that they had another large investor, 12 Clans, ready, willing and able to invest the funds necessary to close the acquisition of the Facility in accordance with the CWT/Idaho Waste Contract.

118.    The Individual/Corporate Defendants knew their material representations were false and misleading when they made them and knew Plaintiffs were unaware that the representations were false.

119.    The Individual/Corporate Defendants also intentionally withheld material information from Plaintiffs to which Plaintiffs were entitled.

120.    Plaintiffs were never informed that CWT had defaulted on the CWT/Idaho Waste Contract in March 2019.

121.    Plaintiffs were not informed in August 2019—when their investment was being solicited—that the CWT/Idaho Waste Contract required that the acquisition of the Facility close by September 27, 2019.

122.    Plaintiffs were not informed in August 2019—when their investment was being solicited—that it was impossible for CWT to timely close on its acquisition of the Facility in compliance with the CWT/Idaho Waste Contract because CWT had not secured the funding needed to close.

123.     Plaintiffs were not informed on September 10, 2019—when they made their first investment of $50,000.00—that it was impossible for CWT to timely close on its acquisition of the Facility in compliance with the CWT/Idaho Waste Contract because it had not secured the funding needed to close.

124.     Plaintiffs were not informed on October 7, 2019—when they made their second investment of $200,000.00—that CWT was then in breach of the CWT/Idaho Waste Contract because CWT had not closed escrow for acquisition of the Facility by September 27, 2019.

125.     Plaintiffs are informed and believe that Defendants did not intend to use the money invested by Plaintiffs for acquisition of the Facility, as Defendants represented.

126.     Rather, Plaintiffs are informed and believe that Defendants used the funds Plaintiffs invested for Defendants' own purposes—a fact they affirmatively misrepresented and withheld from Plaintiffs.  Plaintiffs base this allegation on the fact that their funds were deposited into the R&S trust account then allegedly transferred to DKI.  No accounting of the funds has ever been provided, and the funds were not used for acquisition of the Facility or toward development of the Project.

## THE SAFE HARBOR PROVISION IS INAPPLICABLE

127.     Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

128.     The statutory safe harbor provided for some forward-looking statements under certain circumstances does not apply to any of the false statements Plaintiffs allege herein. The statements plead were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ meaningfully from those in the purportedly forward-looking statements.

129.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements made, the Individual/Corporate Defendants are liable for those forward-looking statements because, at the time they were made, the Individual/Corporate Defendants knew that each forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Corporate Defendants, which knew that the statements were false when made and who concealed material facts regarding the falsity of the forward-looking statement.

## LOSS CAUSATION/ECONOMIC LOSS

130.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

131.    As a direct and proximate result of the foregoing conduct of Defendants, Plaintiffs have been damaged in an amount no less than $250,000.00.

132.    Plaintiffs were induced to make the $250,000.00 investment based upon specific representations regarding acquisition of the Facility, the CWT/Idaho Waste Contract, the anticipated profitability of the Project once developed, and the use of their funds.  Because the Defendants' representations were false, and because Defendants omitted to tell Plaintiffs that the CWT/Idaho Waste Contract had been breached or the failure of Defendants to secure funding sources, Plaintiffs' investment is worth far less than the $250,000.00 they invested. Indeed, even after the transaction closed, no refund or return on investment has been received.

133.    As a result of Defendants' actions, Plaintiffs are out their entire $250,000.00 investment.

134.    All conditions precedent to this action have been performed, satisfied or otherwise discharged.

## FIRST CLAIM FOR RELIEF
### (Fraud – Against Individual/Corporate Defendants)

135.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

136.    "To successfully bring an action for fraud [under Idaho law], a plaintiff must establish the existence of the following elements:  (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.  *Mannos v. Moss*, 143 Idaho 927, 931 (2007).

137.    Immediately prior to and at the time of signing the MOU, the Individual Defendants advised Plaintiffs that the purpose of the $250,000.00 they were about to invest was "to assist IRWS in the acquisition of an operating asset and other related business interests."  MOU, Ex. 3.

138.    It was further explained to Plaintiffs, both before and after signing the MOU, that Plaintiffs' investment would be used to purchase a landfill, although Defendants did not explain to Plaintiffs how Plaintiffs would benefit from the "investment" because Defendants were concealing the fact that they had no intention of conferring any benefit on Plaintiffs.

139.    The statements of Defendants were false and material in convincing Plaintiffs to invest $250,000.00 to $2,000,000.00 with Defendants.

140.    Defendants knew their statements were false because, on information and belief, they did not have the financial wherewithal to consummate the transaction to acquire the Facility for the alleged Project.

141.    Defendants intended that Plaintiffs rely on Defendants' misleading statements so that Plaintiffs would be convinced to invest funds with Defendants.

142.     Plaintiffs are honest people and had no idea that Defendants were misleading them in order to obtain their money.   That is, Plaintiffs were completely ignorant of the fact that Defendants were misleading them regarding the nature of the "investment."

143.     Plaintiffs justifiably relied upon Defendants' statements because: (a) Runft is a licensed Idaho attorney; (b) at the time Runft and Mr. LaKamp re-connected in July 2019, Runft was aware of Plaintiffs' need for Idaho counsel and then referred Plaintiffs to R&S; and (c) Runft thereafter provided legal services to Plaintiffs through R&S.

144.     Plaintiffs have been damaged by the fraudulent concealment of Defendants in an amount to be proven at trial, but an amount not less than $250,000.00, together with interest thereon at the maximum rate allowed by law, and attorneys' fees and costs pursuant to Idaho Code § 12-120.

145.     Based on the foregoing, Plaintiffs are entitled to judgment against Defendants, and each of them, jointly and severally, in an amount in excess of $75,000.00, together with interest thereon at the maximum rate allowed by law.

146.     Plaintiffs are is entitled to an award of their costs and attorneys' fees incurred to prosecute this action as an item of damages.

147.     Pursuant to Idaho Code § 6-1604(2), Plaintiffs will file a pretrial motion seeking leave to amend this Complaint to include a prayer for relief seeking punitive damages for Defendants' oppressive, fraudulent, malicious and outrageous conduct.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

## SECOND CLAIM FOR RELIEF
### (Fraud In The Inducement – Against
### Individual/Corporate Defendants)

148.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

149.    "While normally the terms of a written contract will control, Idaho law firmly allows that fraud in the inducement is always admissible to show that representations by one party were a material part of the bargain. . . .   A contract, including a settlement agreement, that has been procured through the use of fraudulent representations is voidable. . . .   Indeed, '[f]raud vitiates the specific terms of the agreement and can provide a basis for demonstrating that the parties agreed to something apart from or in addition to the written documents.' . . . Therefore, generally, 'the theory is that because of fraud, there was no contract.' . . .   This is the case 'whether the fraud enters into the execution of the contract or is antecedent to it' and 'regardless of any stipulation to the contrary contained in the contract.'" *Budget Truck Sales, LLC v. Tilley*, 2018 Opinion No. 37, page 6 (2018).

150.    Defendants' fraudulent MOU is probably too indefinite and uncertain regarding what, if anything, is being promised by Defendants to constitute a contract, but, even if the MOU could be considered to constitute a contract, it would be voidable by Plaintiffs due to the fact that Plaintiffs' payment of the $250,000.00 was procured by the fraudulent representations and concealment of Defendants.

151.    Immediately prior to and at the time of the signing of the MOU, the Individual Defendants told Plaintiffs that the $250,000.00 they were about to invest was for the purpose of assisting "IRWS in the acquisition of an operating asset and other related business interests," pursuant to the terms of the MOU.

152.    It was further explained by Defendants, both before and after signing the MOU, that Plaintiffs' investment would be used to purchase a landfill, although Defendants did not explain to Plaintiffs how they would benefit from the "investment" because Defendants were concealing the fact that they had no real ability to confer any benefit on Plaintiffs.

153.    The statements by Defendants were false and made by Defendants for the material purpose of convincing Plaintiffs to invest from $250,000.00 to $2,000,000.00.

154.    Defendants knew their statements were false because Defendants never intended to confer any benefit whatsoever on Plaintiffs; rather, Defendants intended to say whatever was needed and whatever smooth talking sales pitch would persuade Plaintiffs to invest, regardless of whether there was a real expectation of return.

155.    Defendants intended that Plaintiffs rely on the false statements so Plaintiffs would be convinced to invest money with Defendants.

156.    Plaintiffs are honest people and had no idea that Defendants were saying whatever was needed to persuade them to invest the $250,000.00, and then another $1,750,000.00.

157.    Plaintiffs justifiably relied upon Defendants' statements because: (a) Runft is a licensed Idaho attorney; (b) at the time Runft and Mr. LaKamp re-connected in July 2019, Runft was aware of Plaintiffs' need for Idaho counsel and then referred Plaintiffs to R&S; and (c) Runft thereafter provided legal services to Plaintiffs through R&S.

158.    Plaintiffs have been damaged by the fraudulent concealment of Defendants in an amount to be proven at trial, but an amount not less than $250,000.00, together with interest thereon at the maximum rate allowed by law, and attorneys' fees and costs pursuant to Idaho Code § 12-120.

159.    Based on the foregoing, Plaintiffs are entitled to judgment against Defendants, and each of them, jointly and severally, in an amount in excess of $75,000.00, together with interest thereon at the maximum rate allowed by law.

160.    Plaintiffs are is entitled to an award of their costs and attorneys' fees incurred to prosecute this action as an item of damages.

161.    Pursuant to Idaho Code § 6-1604(2), Plaintiffs will file a pretrial motion seeking leave to amend this Complaint to include a prayer for relief seeking punitive damages for Defendants' oppressive, fraudulent, malicious and outrageous conduct.

### THIRD CLAIM FOR RELIEF
### (Violation Of The Idaho *Consumer Protection Act* – Against Individual/Corporate Defendants)

162.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

163.    Under Idaho Code § 48-603, the following methods of unfair or deceptive acts or practices in the conduct of any trade or commerce are declared to be unlawful where a person knows, or in the exercise of due care should know, that he has in the past or is:

> (2)    Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> . . .
>
> (5)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;
>
> . . .
>
> (7)    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
>
> . . .
>
> (17)    Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer;

(18)   Engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C, Idaho Code.

164.   Under Idaho Code § 48-603C:

(1)   Any unconscionable method, act or practice in the conduct of any trade or commerce violates the provisions of this chapter whether it occurs before, during, or after the conduct of the trade or commerce.

(2)   In determining whether a method, act or practice is unconscionable, the following circumstances shall be taken into consideration by the court:

. . .

(c)   Whether the alleged violator knowingly or with reason to know, induced the consumer to enter into a transaction that was excessively one-sided in favor of the alleged violator;

. . .

(d)   Whether the sales conduct or pattern of sales conduct would outrage or offend the public conscience, as determined by the court.

165.   Under Idaho Code § 48-608:

(1)   Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter, may treat any agreement incident thereto as voidable or, in the alternative, may bring an action to recover actual damages . . .   Any such person or class may also seek restitution, an order enjoining the use or employment of methods, acts or practices declared unlawful under this chapter and any other appropriate relief which the court in its discretion may deem just and necessary.  The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper in cases of repeated or flagrant violations.

(2)     An elderly person or a disabled person who brings an action under subsection (1) of this section shall, in addition to the remedies available under subsection (1) of this section, recover from the offending party an enhanced penalty of fifteen thousand dollars ($15,000) or treble the actual damages, whichever is greater.

(a)     In order to recover the enhanced penalty, the court must find that the offending party knew or should have known that his conduct was perpetrated against an elderly or disabled person and that his conduct caused one (1) of the following:

. . .

(ii)    Loss of more than twenty-five percent (25%) of the elderly or disabled person's principal monthly income;

(iii)   Loss of more than twenty-five percent (25%) of the funds belonging to the elderly or disabled person set aside by the elderly or disabled person for retirement or for personal or family care or maintenance;

(iv)    Loss of more than twenty-five percent (25%) of the monthly payments that the elderly or disabled person receives under a pension or retirement plan; or

(v)     Loss of assets essential to the health or welfare of the elderly or disabled person.

. . .

(c)     In this subsection:

. . .

(ii)    "Elderly person" means a person who is at least sixty-two (62) years of age.

. . .

(5)     Costs shall be allowed to the prevailing party unless the court otherwise directs.  In any action brought by a person under this section, the court shall award, in addition to the relief provided in this section, reasonable attorney's fees to the plaintiff if he prevails. . . .

166.    By reason of their conduct, Defendants violated the above-referenced Idaho Code § 48-603(2), (5), (7), (17) and (18).

167.    Under Idaho Code § 48-608(1), Plaintiffs are entitled to punitive damages for Defendants' flagrant conduct, for which Plaintiffs, pursuant to Idaho Code § 6-1604(2), will file a pretrial motion seeking leave to amend this Complaint to include a prayer for relief seeking punitive damages for Defendants' oppressive, fraudulent, malicious and outrageous conduct.

168.    Under Idaho Code § 48-608(2), Plaintiffs are elderly persons entitled to treble damages.

169.    Under Idaho Code § 48-608(5), Plaintiffs are entitled to recover their costs and attorneys' fees incurred in pursuing this action.

170.    Based on the foregoing, Plaintiffs are entitled to judgment against Defendants, and each of them, jointly and severally, in an amount in excess of $75,000.00, together with interest thereon at the maximum rate allowed by law.

171.    Plaintiffs are entitled to an award of their costs and attorneys' fees incurred to prosecute this action.

### FOURTH CLAIM FOR RELIEF
**(Intentional Infliction Of Emotional Distress -
Against Individual/Corporate Defendants)**

172.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

173.    Under Idaho law, "a claim for intentional infliction of emotional distress requires a plaintiff to show that (1) the defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a causal connection between the conduct and the emotional distress, and (4) the emotional distress was severe. . . .  Unlike the tort of negligent infliction of emotional distress, intentional infliction of emotional distress does not require injury or a physical manifestation resulting from emotional turmoil." *Walker v. City of Pocatello*, 2018 U.S. Dist. LEXIS 17618, p. 34 (2018).

174.     Defendants' conduct described above constitutes the tort of intentional infliction of emotional distress.

175.     Defendants intentionally or recklessly caused Plaintiffs, particularly Mrs. LaKamp, to suffer severe emotional distress as a result of Defendants' extreme and outrageous conduct described above, which resulted in $250,000.00 of retirement cash essentially disappearing, with another $1,750,000.00 almost going to the same place.

176.     Based on the foregoing, Plaintiffs are entitled to a judgment against Defendants, and each of them, jointly and severally, in an amount in excess of $75,000.00, together with interest thereon at the maximum rate allowed by law.

177.     Plaintiffs are entitled to an award of their costs and attorneys' fees incurred to prosecute this action pursuant to Idaho Code § 12-120 in an amount to be proven at trial.

178.     Pursuant to Idaho Code § 6-1604(2), Plaintiffs will file a pretrial motion seeking leave to amend this Complaint to include a prayer for relief seeking punitive damages for Defendants' oppressive, fraudulent, malicious and outrageous conduct.

### FIFTH CLAIM FOR RELIEF
**(Unjust Enrichment –
Against Individual/Corporate Defendants)**

179.     Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

180.     Under Idaho law, "a *prima facie* case of unjust enrichment consists of three elements: (1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Vanderford v. Knudson*, 144 Idaho 547, 558 (2007).

181.    Defendants effectively defrauded Plaintiffs out of $250,000.00 through smooth talking and giving false hopes of a substantial return on investment.  It would be inequitable for Defendants to retain the benefit of the fraudulently obtained money without Defendants returning the money to Plaintiffs and compensating Plaintiffs for their resulting losses.

182.    Based on the foregoing, Plaintiffs are entitled to a judgment against Defendants, and each of them, jointly and severally, in an amount in excess of $75,000.00, together with interest thereon at the maximum rate allowed by law.

183.    Plaintiffs are entitled to an award of their costs and attorneys' fees incurred to prosecute this action pursuant to Idaho Code § 12-120 in an amount to be proven at trial.

184.    Pursuant to Idaho Code § 6-1604(2), Plaintiffs will file a pretrial motion seeking leave to amend this Complaint to include a prayer for relief seeking punitive damages for Defendants' oppressive, fraudulent, malicious and outrageous conduct.

### SIXTH CLAIM FOR RELIEF
**(Declaratory Judgment -**
**Against Individual/Corporate Defendants)**

185.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

186.    Under Idaho Code § 10-1201:

> Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed.  No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for.  The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree.

187.    Under Idaho Code § 10-1202:

>   Any person interested under a deed, will, written contract or other
>   writings constituting a contract or any oral contract, or whose rights,
>   status or other legal relations are affected by a statute,
>   municipal ordinance, contract or franchise, may have determined
>   any question of construction or validity arising under the instrument,
>   statute, ordinance, contract or franchise and obtain a declaration
>   of rights, status or other legal relations thereunder.

188.    Plaintiffs desire this Court to determine their rights under the above-referenced statutes and the MOU.

### SEVENTH CLAIM FOR RELIEF
**(Federal Securities Fraud**
**[15 U.S.C. §§ 78j, 78t; 17 C.F.R. 240.10b-5]**
**- Against Individual/Corporate Defendants)**

189.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

190.    As described in detail above, the Individual/Corporate Defendants made misrepresentations and omissions of material fact to Plaintiffs in connection with the purchase and sale of their interest in Simco.

191.    Plaintiffs' interest in Simco is a security.

192.    The specific representations and omissions of the Individual/Corporate Defendants made to induce Plaintiffs to make the investment in Simco are set forth in Paragraphs 1 through 191, inclusive, of this Complaint.

193.    The Individual/Corporate Defendants made the representations and omissions described herein with scienter, as the Individual/Corporate Defendants made the representations and omissions with the intent to deceive, manipulate and/or defraud Plaintiffs or, at a minimum, made the foregoing representations and omissions of material fact recklessly, unreasonably and with such an extreme departure from the standard of ordinary care as to present a danger of

misleading Plaintiffs to the extent that the danger was either known to Defendants or so obvious that Defendants must have been aware.  For example, in August 2019 when Defendants were soliciting Plaintiffs' investment, Defendants misrepresented that they had sufficient funding to proceed with acquisition of the Facility in compliance with the CWT/Idaho Waste Contract, and Defendants misrepresented that they would use Plaintiffs' money "to assist IRWS in the acquisition of an operating asset and other related business interests."

194.    Plaintiffs did not know the falsity of Defendants' misrepresentations and omissions, and, instead, reasonably and justifiably relied upon the false misrepresentations and omissions.

195.    Plaintiffs' reliance upon Individual/Corporate Defendants' misrepresentations was the proximate cause of injury to Plaintiffs.

196.    Plaintiffs suffered substantial damages and pecuniary loss as a direct and proximate result of the fraudulent conduct of Defendants in an amount to be proven at trial, but not less than $250,000.00.

197.    As of the filing of this Complaint, Plaintiffs have invested $250,000.00 with Defendants and have received nothing in return for their investment.  Given the failure of CWT to timely close the acquisition of the Facility, Plaintiffs' investment is worth far less than $250,000.00 and is likely worth nothing at all.

198.    The Individual/Corporate Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, each engaged and participated in a continuous course of conduct to make misrepresentations of material facts and to conceal adverse material information about the unregistered securities sold by the Individual/Corporate Defendants, as specifically set forth in this Complaint.

199.    Plaintiffs sue each Individual Defendant and each Corporate Defendant as a primary participant in the wrongful and illegal conduct charged, and/or as a controlling person as alleged below.

200.    By virtue of the foregoing, the Individual/Corporate Defendants have violated Section 10(b) of the *Exchange Act* and Rule 10b-5.

## EIGHTH CLAIM FOR RELIEF
### (Federal Securities Fraud
### [Violation Of Section 20(A) Of The *Exchange Act*] -
### Against Individual/Corporate Defendants)

201.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

202.    The Individual Defendants acted as control persons of the Corporate Defendants and one another within the meaning of Section 20(a) of the *Exchange Act* as alleged above.

203.    The Individual Defendants had the power to influence and control, and did influence and control, directly and/or indirectly, the decision-making by one another and the Corporate Defendants, including the content and dissemination of the various statements and omissions which Plaintiffs contend are false and misleading.

204.    As set forth above, the Individual/Corporate Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

205.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the *Exchange Act*.

206.    As a direct and proximate result of the Individual/Corporate Defendants' wrongful conduct, Plaintiffs have suffered damages of at least $250,000.00, the exact amount of which will be proven at trial, in connection with their purchase of securities from the Individual/ Corporate Defendants.

## NINTH CLAIM FOR RELIEF
### (Federal Securities Fraud
### [Violations of 15 U.S.C. §§ 77l, 77q] - Against
### Individual/Corporate Defendants)

207.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

208.    The Individual/Corporate Defendants' conduct as alleged herein violates the *Securities Act of 1933*, 15 U.S.C. §§ 77a, *et seq*. ("Act"), and, specifically, Sections 12 and 17 of the Act, 15 U.S.C §§ 77l and 77q, in that they used interstate commerce for fraud and deceit as described herein, and offered and sold securities in interstate commerce with written material, including the MOU, that included untrue statements of material fact and omissions of material fact.

209.    As a direct and proximate result of the Individual/Corporate Defendants' wrongful conduct, Plaintiffs have suffered money damages of at least $250,000.00, the exact amount of which will be proven at trial, in connection with their purchase of securities from the Individual/Corporate Defendants.

## TENTH CLAIM FOR RELIEF
### (Idaho Securities Fraud -
### Against Individual/Corporate Defendants)

210.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

211.    Plaintiffs' interest in Simco is a security.

212.    The Individual/Corporate Defendants sold the security in Simco to Plaintiffs in violation of Idaho Code § 30-14-301, entitling Plaintiffs to the remedies set forth in Idaho Code § 30-14-509, including recovery of their investment and attorneys' fees and costs.

213.     As described in detail above, the Individual/Corporate Defendants made misrepresentations and omissions of material fact to Plaintiffs in connection with the purchase and sale of securities in Simco.

214.     Defendants' specific representations and omissions to induce Plaintiffs to make the investment in Simco are described in Paragraphs 1 through 213, inclusive, of this Complaint.

215.     Defendants made the representations and omissions described herein with scienter, as Defendants made the representations and omissions with the intent to deceive, manipulate and/or defraud Plaintiffs or, at a minimum, made the foregoing representations and omissions of material fact recklessly, unreasonably and with such an extreme departure from the standard of ordinary care as to present a danger of misleading Plaintiffs to the extent that the danger was either known to Defendants or so obvious that Defendants must of been aware.  For example, in August 2019 when Defendants were soliciting Plaintiffs' investment, Defendants misrepresented that they had sufficient funding to proceed with acquisition of the Facility in compliance with the CWT/Idaho Waste Contract, and Defendants misrepresented that they would use Plaintiffs' money "to assist IRWS in the acquisition of an operating asset and other related business interests."

216.     Plaintiffs did not know the falsity of Defendants' misrepresentations and omissions, and, instead, reasonably and justifiably relied upon the false misrepresentations and omissions.

217.     Plaintiffs' reliance upon Defendants' misrepresentations was the proximate cause of injury to Plaintiffs.

218.    Plaintiffs suffered substantial damages and pecuniary loss as a direct and proximate result of the fraudulent conduct of Defendants in an amount to be proven at trial, but not less than $250,000.00.  Plaintiffs have invested $250,000.00 with Defendants and have received nothing in return for their investment.  Given the failure of CWT to timely close the transaction for acquisition of the Facility, Plaintiffs' investment is worth far less than $250,000.00 and is likely worth nothing at all.

219.    Plaintiffs sue each Individual Defendant and each Corporate Defendant as a primary participant in the wrongful and illegal conduct charged, and/or as a controlling person as alleged herein.

220.    By virtue of the foregoing, the Individual/Corporate Defendants have engaged in fraud as set forth Idaho Code § 30-14-501, and are liable to Plaintiffs as set forth in Idaho Code § 30-14-509, including for the restitution of Plaintiffs' $250,000.00, together with interest thereon at the annual rate set forth in Idaho Code § 28-22-104(2) from the date of Plaintiffs' investment, as well as Plaintiffs' costs and reasonable attorneys' fees.

## ELEVENTH CLAIM FOR RELIEF
### (For Professional Negligence [Attorney Malpractice] -
### Against Runft And R&S)

221.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

222.    In or about September 2019, Runft offered the legal services of R&S to Plaintiffs.

223.    Plaintiffs engaged in confidential communications with Runft and his partner, Jon Steele, throughout the summer of 2019 regarding Plaintiffs' legal needs.

224.    On or about September 18, 2019, Plaintiffs and R&S entered into the Legal Services Agreement, although Plaintiffs had been receiving legal advice from R&S before that date and during the time that Runft was soliciting Plaintiffs' investment to acquire the Facility and development of the Project.

225.    As Plaintiffs' counsel, Runft and R&S owed a duty of care to Plaintiffs, requiring Runft and R&S to exercise the knowledge, skill and ability ordinarily exercised by other similarly situated lawyers.

226.    Contrary to that duty, Runft and R&S were professionally negligent.  Runft failed to advise Plaintiffs of the nature and extent of his involvement with the acquisition of the Facility and/or with the Project, his ownership interest in and relationship to the Corporate Defendants, or Runft's conflict of interest.

227.    Because of his conflict of interest, Runft negligently failed to give professional counsel and advice that an ordinary lawyer would give in the same circumstances, leading to Plaintiffs' damages.

228.    The conflict Runft had in this instance was not a conflict to which Plaintiffs could consent because there would be no way for Runft or R&S to represent Plaintiffs' investment competently, diligently or ethically in Runft's own venture.

229.    Contrary to their duty, Runft and R&S were professionally negligent in not disclosing the conflict and failing to give Plaintiffs competent advice.

230.    The negligent acts and omissions of Runft and R&S were below the standard of care for comparable attorneys who practice in the Idaho legal community.

231.    Runft and R&S's professional negligence was the proximate cause of Plaintiffs' loss of their $250,000.00 investment.

232.    Runft and R&S's failure to comply with Rule 1.7 of the *Idaho Rules of Professional Conduct* constitute negligence in and of itself.

233.    But for Plaintiffs' reliance on Runft and R&S as their trusted attorneys, Plaintiffs would not have invested in the scheme described herein.

234.    Runft's simultaneous representation of Plaintiffs while advising them to invest in the acquisition of the Facility and the development of the Project was a clear dereliction of his professional duty of care to Plaintiffs.

235.    As a direct and proximate result of Runft and R&S's incompetence and professional negligence, Plaintiffs have suffered money damages of at least $250,000.00, the exact amount of which will be proven at trial.

## TWELFTH CLAIM FOR RELIEF
### (For Breach Of Fiduciary Duty -
### Against Runft And R&S)

236.    Plaintiffs repeat and incorporate all preceding paragraphs as if fully set forth herein.

237.    A client's retention of a law firm gives rise to a fiduciary relationship between the attorney, the law firm and the client.

238.    The scope of an attorney's fiduciary duties are determined based upon the *Idaho Rules of Professional Conduct*, together with other statutes and general principles relating to fiduciary relationships.

239.    These fiduciary duties include duties of care and loyalty, an obligation to keep the client informed, and to avoid conflicts of interest.

240.     Runft and R&S breached their fiduciary duty by failing to inform Plaintiffs of the conflict of interest and taking advantage of Plaintiffs' trust in, and reliance on their fiduciary relationship with Runft and R&S for personal gain.

241.     In breaching their fiduciary duties and professional responsibilities to Plaintiffs, Runft and R&S committed the following wrongful acts and omissions in their failure to:

      a.     Advise Plaintiffs of the conflict of interest;

      b.     Provide competent legal advice regarding Plaintiffs' investment in the Facility and Project; and

      c.     Provide a proper trust accounting.

242.     As a direct and proximate result of various fiduciary breaches by Runft and R&S, and each of them, Plaintiffs have suffered damages of at least $250,000.00, the exact amount of which will be proven at trial.

## ATTORNEYS' FEES AND COSTS

Plaintiffs have been required to retain the services of an attorney to bring this suit and are entitled to an award of reasonable attorneys' fees incurred pursuant to 15 U.S.C. § 78u-y(c), and Idaho Code §§ 48-608, 30-14-509, 12-120(3) and 12-123.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of no less than twelve (12) persons on all issues so triable in accordance with Rule 38 of the Federal Rules of Civil Procedure.

/ / / /

/ / / /

/ / / /

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

A.      For damages in excess of $75,000.00, together with interest thereon at the maximum rate allowed by law;

B.      For punitive damages if allowed by this Court under Idaho Code § 6-1604(2);

C.      For attorneys' fees, expenses and costs incurred herein;

D.      For prejudgment interest; and

E.      For such other and further relief as the court may deem just and proper.

**DATED** this 30th day of November 2020.

McCONNELL WAGNER SYKES & STACEY PLLC

_____/s/_ _Jeff R. Sykes_____

By:     Jeff R. Sykes, Attorneys For Plaintiffs
        Charles M. LaKamp and Marianne LaKamp