UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| CHARLES M. LAKAMP and MARIANNE LAKAMP, husband and wife, individually and as Trustees of THE LAKAMP FAMILY TRUST UTD FEBRUARY 23, 1999; and CHARLES M. LAKAMP, doing business as METROM ASSOCIATED SERVICE, a California sole proprietorship,<br><br>          Plaintiffs,<br><br>v.<br><br>JOHN L. RUNFT, an individual; JOHN CRIGLER, an individual; JOHN MALLETTA, an individual; CWT, LLC, an Idaho limited liability company; IRWS LLC, an Idaho limited liability company; DORFKRÜG INTERNATIONAL, INC., an Idaho corporation; SIMCO VENTURE FUND, LLC, an Idaho limited liability company; RUNFT & STEELE LAW OFFICES, PLLC, an Idaho professional limited liability company; and DOES 1 through 50, inclusive,<br><br>          Defendants. | Case No. 1:20-cv-00544-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

**I. INTRODUCTION**

Pending before the Court are five motions for summary judgment.[1] The Court held

---

[1] The First Motion for Summary Judgment was filed by Defendants CWT, LLC, John Crigler, DorfKrüg International, Inc., and Simco Venture Fund, LLC. Dkt. 76. The Second Motion for Summary Judgment was filed by Defendant John Malletta. Dkt. 78. The Third Motion for Summary Judgment was filed by

a hearing on the motions on September 2, 2022, and took the matters under advisement. Upon review, and for the reasons stated below, the Court GRANTS all of the Defendants' Motions for Summary Judgment (Dkts. 76, 78, 79, 80) and GRANTS in PART and DENIES in PART the Counter Defendants' Motion for Summary Judgment (Dkt. 81). The Court also DENIES as MOOT Plaintiffs' Motion to Amend Pleadings to Add Punitive Damages (Dkt. 77) and their Motion to Supplement (Dkt. 122).

## II. BACKGROUND

### A. Factual Background

#### 1. Parties

Plaintiffs Charles and Marianne LaKamp are husband and wife and California citizens. Dkt. 45, at 1. In 2019, the LaKamps invested $250,000 in a landfill project in Elmore County, Idaho. That landfill was originally owned by non-party Idaho Waste Services, Inc. ("Idaho Waste"). Defendant IRWS, LLC ("IRWS") is the current owner and operator of the landfill. Dkt. 76-1, at 5.

The transaction by which IRWS acquired the landfill had two distinct parts. Dkt. 76-1, at 5. First, Defendant CWT, LLC ("CWT") was formed in 2019 for the purpose of acquiring the landfill property from Idaho Waste. *Id.* Second, simultaneously with the closing of the Idaho Waste-to-CWT transaction, CWT would then convey the landfill assets and additional assets to IRWS. *Id.*

---

Defendant IRWS, LLC. Dkt. 79. The Fourth Motion for Summary Judgment was filed by Defendants John Runft and Runft & Steele Law Offices, PLLC. Dkt. 80. And the Fifth Motion for Summary Judgment was filed by Counter Defendants Charles LaKamp, Marianne LaKamp, LaKamp Family Trust UTD 02.23.99, and Metrom Associated Service. Dkt. 81.

Defendant Simco Venture Fund, LLC ("Simco") was formed for the purpose of becoming the majority member of IRWS post-closing of the landfill acquisition. Dkt. 76-1, at 5. Defendant Dorfkrüg International, Inc. ("DKI") is a member of Simco. Dkt. 76-1, at 5. Defendant John Crigler is the President and CEO of DKI and a member of CWT. Dkt. 76-1, at 5. In addition to DKI, a non-party Indian Tribe in Minnesota, Twelve Clans, Inc. ("Twelve Clans") is also an entity member of Simco.[2] Dkt. 81-2, at 6.

In addition to Simco, the other entity members of IRWS are Timber Canyon-MT, LLC; 2CK Investments, LLC; Koppinger Investments, LLC; Valerian, LLC; and Jeff and Son, LLC. Dkt. 78-1, at 3. Defendant John Malletta has an interest in IRWS through Timber-Canyon-MT, LLC. Dkt. 78-1, at 3. Defendant John Runft is also as a member of IRWS. Dkt. 77-4, at 41.

Runft is an Idaho attorney who first told Charles LaKamp about the landfill acquisition project. Dkt. 80-2, at 3. Runft's law firm at the time was Defendant Runft & Steele Law Offices, PLLC (R&S). Neither John Runft nor R&S has any ownership in Simco or any ownership in its entity members. Dkt. 80-2, at 6.

### 2. LaKamps' $250,000 Investment

This suit revolves around $250,000 Charles and Marianne LaKamp invested as part of the above-mentioned landfill project. The nature of that investment is hotly contested, but the facts leading up to the investment are relatively clear.

Charles LaKamp and John Runft met at the Miner's Jubilee in Baker City, Oregon,

---

[2] Twelve Clans is a sovereign wealth fund of the Ho-Chunk Indian Nation.

in July 2019. Dkt. 80-2, at 3. Charles LaKamp was an accomplished businessman and was looking for investment opportunities in Idaho. *Id.* at 2. Runft was an attorney at R&S in Boise, Idaho. Dkt. 45, at ¶ 11.[3] Charles LaKamp asked Runft if he knew of any such opportunities, and Runft told Charles LaKamp about his involvement in the IRWS landfill project. Dkt. 80-2, at 3.

A couple of months after the Jubilee, Charles LaKamp hired John Steele, another attorney at R&S, to assist with the purchase of real property in Nampa, Idaho. Dkt. 80-2, at 7; Dkt. 81-2, at 2. This property purchase was entirely unrelated to the landfill project. Dkt. 80-2, at 7.

Meanwhile, Runft sent Charles LaKamp a business asset appraisal, draft commitment letter, and draft subscription agreement and investor questionnaire related to the IRWS investment. *Id.* On behalf of IRWS, Runft solicited Charles LaKamp for a $2 million investment in exchange for 10% equity in IRWS. Dkt. 77-4, at 22–40 (September 4, 2019 email, Commitment Letter, and Subscription Agreement). Charles LaKamp rejected that offer, calling it "wishful thinking" on Runft's part. Dkt. 80-2, at 4.

However, Charles LaKamp did invest $250,000 related to the landfill project. Charles LaKamp contends that this money was a "short term loan" for IRWS to purchase a railcar tipper. Dkt. 80-2, at 4. Runft denies ever having a conversation with Charles LaKamp about a loan for a railcar tipper. *Id.* On September 9, 2019—only a few days after Runft sent Charles LaKamp the offer for the $2 million IRWS investment—Runft emailed

---

[3] Runft is still a practicing attorney; however, as mentioned above, R&S no longer exists.

the following message to Charles LaKamp:

> Dear Chuck,
>
> This confirms our conversation this evening wherein you have committed to invest Two Hundred Fifty Thousand Dollars ($250,000.00) in the landfill project for 10/8 or 1.25% ownership equity at final closing as we have discussed. I will prepare the appropriate documentation.
>
> Previous negotiations for a larger investment at this time are acknowledged to be now terminated due to unanticipated, intervening circumstances.
>
> Payment of the sum of $250,000.00 will be paid in two (2) tranches, the first for the sum of $50,000 on Tuesday, 9-10-19 the second for the sum of $200,000.00 within Ten (10) days thereafter. In further consideration of the investment under the circumstances appertaining, IRWS, LLLC, hereby confirms that you will have a first right of refusal for future investment opportunities in the landfill project for the next Two (2) years in the range of up to Two Million Dollars ($2,000,000.00). Let me only add that given the intervening circumstances that occurred on the heels of the previous negotiations, your commitment to nevertheless proceed with the $250,000.00 is very much appreciated by all concerned.
>
> Best Regards,
>
> John L. Runft

Dkt. 45-2, at 8.

Thereafter, Charles LaKamp wired $50,000 and later another $200,000 to an R&S trust account. Dkt.45-2, at 12. The trust account arrangement was in accordance with a Memorandum of Understanding ("MOU") signed on September 24, 2019, by Charles LaKamp, John Malletta (president of IRWS), and John Crigler (president of DKI). Dkt. 81-2, at 3. The MOU was not signed by Twelve Clans. *See id.* Under the terms of the MOU, Charles LaKamp's money was to be directed to DKI, which was a client of R&S. Dkt. 80-2, at ¶ 10. The MOU states in its entirety:

In August of 2019, the parties outlined above, IRWS excluded, agreed to enter into a single purpose entity Simco Venture Fund, LLC, ("Simco") for the purpose of investing into IRWS, LLC ("IRWS" or "Project") to assist IRWS in the acquisition of an operating asset and other related business interests. The original arrangement between the parties stipulated that [Charles LaKamp] was to receive an interest of Ten Percent (10%) in the final project, which would have been reflected as Sixteen and Five Tenths (16.5%) interest in Simco, in exchange for a Two Million Dollar ($2,000,000) contribution ("Contribution") to Simco of which Five Hundred Thousand was to be directed to DKI to be allocated to cost coverage and the remainder to be held and directed by Simco as may be needed in the final Project.

Due to unforeseen circumstances, [Charles LaKamp] is requesting that the aforementioned option remain open but with the understanding that [Charles LaKamp], if able, will make the contribution in the near future and not expected to occur until post-closing/funding of the Project. The parties hereby agree and understand that [Charles LaKamp] has invested $250,000.00 for a Two and Two Tenths (2.2) interest in Simco to date, of which 100% of the funds were directed to DKI for cost coverage and that [Charles LaKamp], if able, would like to retain the option ("the Option") to contribute an additional One Million Seven Hundred and Fifty Thousand Dollars ($1,750,000) and in doing so, obtain the remaining Fourteen and Three Tenths interest in Simco to arrive at the original anticipated outcome as outlined above.

Dkt. 45-2, at 6–7.

Charles LaKamp wired the first $50,000 on September 10, 2019, before he signed the MOU. Dkt. 45-2, at 12. He then wired the remaining $200,000 on October 7, 2019, after he signed the MOU. Dkt 45-2, at 12. Runft instructed Charles LaKamp on how to wire the money. Dkt. 45-2, at 15.

Neither Runft nor R&S was involved in the discussions leading up to the MOU's terms, and neither even knew of the MOU terms until after it was signed. Dkt. 80-2, at 5.

On January 14, 2020, Charles LaKamp sent his personal financial statement to

MEMORANDUM DECISION AND ORDER - 6

Simco and authorized Simco to disclose that information to CWT and Idaho Waste as needed to accomplish the landfill acquisition. Dkt. 79-4, at 25.

Around that same time, or not long after, Charles LaKamp became worried about his investment. Dkt. 45, at 17. He hired attorneys to look into the investment arrangement. *See* Dkt. 45-2, at 34. In February 2020,[4] one of the LaKamps' attorneys, J.D. Sullivan, had an email exchange with Runft. Dkts. 97-1, at 14; 97-2, at 12–14. From the emails, it seems that Runft requested Charles LaKamp get an independent attorney "before proceeding much further with plans involving [Charles LaKamp] in projects in which [Runft had] an interest." Dkt. 97-2, at 13. Charles LaKamp hired Sullivan as that attorney. *Id.* Sullivan asked Runft for a conflict waiver for his client. *Id.* Runft never provided such a waiver. Dkt. 97-1, at 14. Runft explained that the only reason he advised the LaKamps to hire independent counsel, and the only reason for a conflict waiver, was because the LaKamps were considering whether to proceed in exercising their option to invest more and the LaKamps had by that point hired R&S for the Nampa property purchase. Dkts. 80-1, at 17–18; 80-3, at 4–5. On March 12, 2020, Sullivan informed Runft that the LaKamps would not be exercising their option, so Runft believed the conflict waiver was no longer needed. Dkts. 80-1, at 17–18; 80-3, at 5.

Also, on March 12, 2020, Charles LaKamp asked for the $250,000 to be refunded to him. *Id.* To date, it has not been refunded.

The Defendants all agree that the LaKamps own 2.2% of Simco, acquired in

---

[4] The LaKamps report this as February *2021*, but the emails are actually dated *2020*. The Court assumes this is a typographical error on the LaKamps' part.

exchange for the $250,000 investment. However, the LaKamps argue that they do not have any interest in Simco because the operating agreement does not list their ownership and because the MOU was not signed by Twelve Clans.

### 3. *Idaho Waste Lawsuit*

In January 2020, CWT sued Idaho Waste Services, Inc. ("Idaho Waste"), seeking specific performance of the purchase and sale agreement of the landfill. Dkt. 96-1, at 1–2. Leading up to the Idaho Waste lawsuit, the relationship between CWT and Idaho Waste was strained at best. *Id.* at 2.

LaKamps' counsel, J.D. Sullivan, reached out to Idaho Waste's attorney, William Ghiorso, on May 29, 2020. Dkt. 81-2, at 5; Dkt. 96-1, at 3. Sullivan and Ghiorso also spoke on June 1, June 2, June 18, June 26, July 9, July 29, and October 15, 2020.[5] Dkt. 81-2, at 5; Dkt. 96-1, at 3. While the LaKamps have not disclosed the exact details of those conversations—citing attorney-client privilege—the conversations regarded LaKamps' "adversarial relationship" to Defendants and the "common legal concerns" of the LaKamps and Idaho Waste. Dkt. 81-2, at 5. Sullivan told Ghiorso that the LaKamps were planning to file a lawsuit against Defendants. Dkt. 96-1, at 3.

CWT and Simco allege that Ghiorso "used that information as a weapon against CWT, and forced CWT to settle on far less favorable terms than it was entitled to." Dkt. 96, at 3.

---

[5] There was also some email correspondence between Sullivan and Ghiorso. Dkt. 96-1, at 5. Originally, both Sullivan and Ghioroso denied there ever being any emails sent between them, but on April 1, 2022, Plaintiffs identified these emails in their privilege log. *Id.*

### B.  Procedural Background

The LaKamps filed this lawsuit on November 30, 2020. Dkt. 1. They filed an Amended Complaint on June 30, 2021. Dkt. 45. The Amended Complaint has twelve claims: (1) fraud; (2) fraud in the inducement; (3) violation of the Idaho Consumer Protection Act; (4) intentional infliction of emotional distress; (5) unjust enrichment; (6) declaratory judgment under Idaho Code §§ 10-1201, -1202; (7) federal securities fraud under 15 U.S.C. §§ 78j, 78t; (8) federal securities fraud, violation of Section 20(A) of the Exchange Act; (9) federal securities fraud under 15 U.S.C. §§ 771, 77q; (10) Idaho securities fraud; (11) attorney malpractice; and (12) breach of fiduciary duty. *Id.* The eleventh and twelfth claims—malpractice and breach of fiduciary duty—are alleged only against Runft and R&S. All other claims are alleged against all Defendants.

CWT and Simco filed a Counterclaim on July 19, 2021. Dkt. 48. CWT brings one claim for intentional interference with contract. *Id.* Simco brings one claim for breach of fiduciary duty. *Id.* And together, CWT and Simco bring one claim for intentional interference with prospective economic gain. *Id.*

On May 6, 2022, the parties in this case filed five motions for summary judgment: CWT, Crigler, DKI, and Simco filed the First Motion for Summary Judgment. Dkt. 76. Malletta filed the Second Motion for Summary Judgment. Dkt. 78. IRWS filed the Third Motion for Summary Judgment. Dkt. 79. Runft and R&S filed the Fourth Motion for Summary Judgment. And the LaKamps filed the Fifth Motion for Summary Judgment, which regards the Counterclaim(s). Dkt. 81.

Additionally, on that same day, the LaKamps filed a Motion for Leave to File

Amended Complaint to Seek Punitive Damages. Dkt. 77. That motion does not ask to change the allegations in the operative Amended Complaint but simply to add a request for punitive damages.

Nearly a month later, the LaKamps filed a Motion to Dismiss John Malletta after his death. Dkt. 92. For reasons explained in the Court's July 27 Memorandum Decision and Order, the Court substituted John Malletta's Estate for Malletta. Dkt. 112. Therefore, the Court will still consider Malletta's motion for summary judgment.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view the facts in the non-moving party's favor." *Id.* (cleaned up). To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent

must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

While the Defendants filed their motions for summary judgment in four groups, there are substantial similarities between their positions. Likewise, the LaKamps' opposition to these four motions is largely consistent. That said, because some of the claims are alleged against only some of the Defendants and the Defendants' arguments are not identical, the Court will review each motion separately. However, before doing so, the Court will explain the general tenor of the Defendants' arguments and Plaintiffs' arguments.

Most of the LaKamps' claims are predicated on the theory of fraud. In their Amended Complaint, the LaKamps allege that they invested $250,000 to IRWS for a stake in that company based on misrepresentations about the landfill transaction. *See generally* Dkt. 45. The LaKamps allege they received nothing in return for that investment. Dkt. 45 at ¶ 133.

The Defendants have various arguments but at the core of each is Charles LaKamp's deposition. That deposition changes the central focus of the fraud. Charles LaKamp testified at great length that he did not intend to *invest* $250,000 but rather that he intended to *loan* $250,000 to IRWS for the purpose of acquiring a railcar tipper.

There are only two references to a railcar tipper in the entire Amended Complaint:

58. Through the course of Plaintiffs' communications with the Individual

Defendants, the Individual Defendants represented to Plaintiffs that their funds would be used "to assist IRWS in the acquisition of an operating asset and other related business interests" . . . and the Individual Defendants specifically represented that:

. . .

 f. The initial $50,000.00 investment was needed to acquire equipment to unload entire rail cars of used tires for recycling at the Facility; and
 g. Plaintiffs would receive a return on their investment by way of 1.25% ownership equity (per Runft email of September 9, 2019), later characarized as "Two and Two Tenths (2.2) interest in Simco" (per . . . *Memorandum of Understanding* dated September 24, 2019).

. . .

69. During the August 2019 negotiations regarding Plaintiffs' investment, Plaintiffs received no documentation such as stock certificates, bylaws or operating agreement and, indeed, it was unclear: (a) in which entity or entities they would have an interest; (b) where their funds were being invested; (c) how their funds were to be used other than the questionable assertion that $50,000.00 was to be used to acquire *railcar unloading equipment*; or, (d) specifically how they were to receive a return on their investment.

Dkt. 45, at ¶ 69. These buried references to the railcar tipper fail to bridge the gap between Charles LaKamp's deposition about a loan and the allegations in the Amended Complaint about a fraudulent investment.

 Mr. LaKamp's deposition is critical to nearly every claim at issue. Thus, while lengthy, the Court reviews certain relevant excerpts as follows:

Q: Do you recall a proposed investment by you in IRWS, LLC?

A: Indirectly.

Q: What do you mean by that?

A: The original investment—again, my original investment in anything was a quarter million dollars for a railcar tipper, that in these streams that I could find that were supplied from Mr. Runft isn't mentioned was to give him the money to buy a railcar tipper as they expected to close other purchase of the site . . . . And in the process, he asked would I be interested in helping. They had a good deal on getting a second railcar tipper, and would I be interested in helping purchase it. For that purpose, I forwarded in two pieces a quarter

of a million dollars that would help purchase that railcar tipper. So that would have been indirectly an investment in IRWS. Other than that, IRWS was a done deal at that time as far as I knew.

Q: Okay. Let's go back just a moment. What were you—what did you believe you were getting in exchange for your . . . quarter-million-dollar investment? Was it a loan? Were you getting a promissory note? What were you getting in exchange for that?

A: At that point it was unclear. The money was supposed to go into a trust, and I was supposed to have some form of security for the railcar tipper that could be worked into a larger proposition. That developed later, but at the time, **it was strictly a loan to purchase something, and I expected to be paid back.**

. . .

[Shows LaKamp the documents Runft sent Charles LaKamp regarding $2 million investment for 10% equity in IRWS]

Q: And have you had a chance to just briefly review the first page to see if you recognize the document?

A: Okay. I recognize the first page and the content. It was nice of John [Runft] to whip this together quickly.

Q: And what do you mean by "quickly"?

A: Well, by then, I had already run into—so this is dated September 4th, 2019. And I'm thinking that that early on, they're still expecting to close on the document and the site with Corban Capital late in September. So while it's a nice document, **I probably just circular filed the thing.**

. . .

[Shows Charles LaKamp the email from Runft dated September 2, 2019]

Q: Right. Going back to Exhibit 51, which is the September 2nd, 2019, email, did you contact Mr. Runft or respond to this email and say, wait a minute, this doesn't bear any relationship to what my concept is, and that is a collateralized loan for a railway tipper?

A: No. I did not talk to him further. The money that I was talking about was a quarter million dollars for a railroad tipper that was supposed to go into IRWS and, as such, could have been part of a small or larger investment if I chose to take an equity position, which I had not.

MEMORANDUM DECISION AND ORDER - 13

. . .

[Shows Charles LaKamp the email from Runft dated September 4, 2019]

Q: So did you respond to this email that is Exhibit 54?

A: I repeat it, I did not.

Q: Did you call John Runft and say, "This is crazy"?

A: **Frankly, I've already told you I didn't see it because if it's an attachment, I probably didn't download it, whether he sent it to me or not, and it wasn't of an interest at the time. They had a deal together, and all they're doing is looking at backup. I'm sorry. Didn't interest me.**

. . .

[Shows Charles LaKamp the email from Runft dated September 9, 2019 (text shown above)]

Q: Do you recall reading this email?

A: I do. And as far as it goes, it's a fairly short email. Has to do with money, so that keeps the number—the verbiage down. You'll notice it goes on to—it confirmed that I have the right to invest more money, up to $2 million. **This is, I think, on John's part, wishful thinking,** but it's there. Yes, I'm familiar with the email.

. . .

[Shows Charles LaKamp the MOU (text shown above)]

Q: In the middle of that paragraph it says: "The parties hereby agree and understand that CLK," which is you, "has invested $250,000 for a two and two tenths (2.2) interest in Simco to date." What do you understand that to have meant?

A: **Well, it would imply that I've already agreed . . . to give Simco $250,000, and while it's interesting—and I did sign the back of it. Probably not a very good job on my part—that was never my intention anyway.**

. . .

Q: Okay. And there was no other reason why you were going to be sending those—that $250,000 over to Runft & Steele; is that right?

A: That was the reason I sent the money to Runft & Steele, so that they would

have the funds to secure the railcar tipper.

Q: Okay. And everything that you knew about this railcar tipper came from your meeting in August of 2019 with—my understanding it was with John Runft and John Crigler?

A: Actually, it was with John Runft.

Q: Just John Runft. Okay. And the $250,000, why did you pay that number? Why did you pay that amount?

A: That's the money he asked for to secure the railcar tipper. He did not represent that that was all it cost, either more or less. He just required that much money, which was not available to him at the time, and they were expecting to close in late September.

. . .

Q: So you have no way to recall anything more about that conversation?

A: I don't recall a whole lot about that conversation other than they needed the funds to secure a railcar tipper. He didn't tell me what kind. I didn't ask. He didn't tell me how much. **I didn't ask. It was intended as a short-term loan** until you closed your deal back in September of 2019. Then it was supposed to be sorted out.

. . .

Q: Between that August meeting with John Runft and the second payment in—on October 7th of 2019, did you have any other conversations with John Runft about the railcar tipper as the object of that—those funds?

A: No. . . .

. . .

Q: So between August of 2019 and October of 2019, did you have any conversations with John Crigler about the $250,00 being purposed for a railcar tipper?

A: No. . . .

. . .

A: . . . I had no real conversation with Crigler . . . .

. . .

MEMORANDUM DECISION AND ORDER - 15

Q: Yes. You were acting as the creditor, the lender. Who was acting as the debtor, the borrower?

A: **The only person I talked to directly on that matter was John Runft on behalf of, I thought, IRWS.**

. . .

Q: So do I understand you correctly that your complaint is that you lent money based upon an oral promise and that money has not been paid back to you?

A: Would you care to put that in English, plain English, for us common folk?

Q: You wanted to help a friend.

A: That's a good start.

Q: And you agreed to lend them some money.

A: Good way to look at it.

Q: And they haven't paid it back.

A: I expected it would be—

Q: —is that correct?

A: —paid back; that's right.

. . .

Q: Okay. Do you have any idea as we sit here today what a two-and-two-tenths-percent ownership interest in Simco Venture Fund is worth?

A: No.

Q: Do you have any belief that it is less than $250,000?

A: I have no knowledge on the subject at all.

Dkt. 76-3, at 34–67 (emphases added).[6]

According to the Defendants, the record shows two distinct investments pitched to the LaKamps. The first was an investment in IRWS, solicited by Runft. The LaKamps

---

[6] Marianne LaKamp was also deposed. She testified that she did not know any details of the investment and relied on Charles LaKamp to handle this and other investments. Dkt. 78-2, at 106.

rejected that offer to invest in IRWS. The second was an investment in Simco, as reflected in the MOU. The LaKamps agreed to that investment, and the management of that money was carried out as agreed in the MOU.

In reply, the LaKamps argue that the MOU was never finalized because it was not signed by Twelve Clans. The LaKamps also argue that the Charles LaKamp deposition viewed in context of the whole record leaves some factual questions for a jury to resolve.

The Court now reviews the Defendants' motions for summary judgment in turn.

## A. First Motion for Summary Judgment – CWT, Crigler, DKI, and Simco

CWT, Crigler, DKI, and Simco (collectively, the "Simco Defendants") raise several arguments in support of their request that the Court grant summary judgment on all claims levied against them. Some of those arguments apply only to specific claims, but there are three overarching arguments that apply to all of the claims: (1) Charles LaKamp testified about a loan agreement, not a fraudulently induced investment, and the Amended Complaint alleges no claims about a loan agreement; (2) Charles LaKamp testified that he spoke only to Runft about the loan agreement and not to any of the Simco Defendants; and (3) the LaKamps cannot prove any damages because they have a 2.2% interest in Simco, and there is no evidence to suggest that the 2.2% interest is worth less than $250,000.

With that background about the overarching arguments, the Court now evaluates each claim alleged against the Simco Defendants.

### 1. Fraud

Under Idaho common law, a plaintiff must prove the following elements to succeed with a fraud claim:

MEMORANDUM DECISION AND ORDER - 17

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*G & M Farms v. Funk Irrigation Co.*, 808 P.2d 851, 855 (Idaho 1991).

The Simco Defendants focus on three of these elements—reliance, representation, and consequent and proximate injury.

### a.  Reliance

First, the Simco Defendants argue that the LaKamps did not rely—let alone *justifiably* rely—on any misrepresentations any of them made. Pointing to the above-referenced deposition, the Simco Defendants argue that Charles LaKamp relied solely on the communications with Runft to make his decision to give the $250,000. Indeed, Charles LaKamp testified that he only spoke to "John Runft on behalf of . . . IRWS" about the railcar tipper. Dkt. 76-3, at 62. Charles LaKamp also testified that he "had no real conversation with Crigler." *Id.* at 61. And when asked what the MOU said, Charles LaKamp testified, "Well, it would imply that I've already agreed . . . to give Simco $250,000, and while it's interesting—and I did sign the back of it. Probably not a very good job on my part—that was never my intention anyway." Dkt. 76-3, at 49. Multiple times during the deposition, Charles LaKamp suggested he did not read emails and documents regarding the transaction. *See, e.g.*, Dkt. 76-3, at 41, 44.

In their response brief, the LaKamps point to two pieces of evidence they believe show justifiable reliance on the railcar tipper promise. They first point to an email sent by Runft and on which Crigler was copied. This is the September 9, 2019 email, which text is

provided above, and which says, in relevant part, that "[p]revious negotiations for a larger investment at this time are now terminated due to unanticipated, intervening circumstances," that the $250,000 will be paid in two sums, and that the LaKamps would receive 1.25% equity in the landfill project. Dkt. 77-4, at 21. This email does not mention the railcar tipper or any loan. The LaKamps next point to the MOU, which they contend Crigler drafted. Again, the MOU does not say anything about a railcar tipper. Rather, it discusses the 2.2% interest in Simco and the $250,000 being directed to DKI. While the MOU does say the investment is "to assist IRWS in the acquisition of an operating asset and other related business interests," there is no factual dispute as to whether the MOU was a misrepresentation about a railcar tipper. What's more, Charles LaKamp testified that he did not rely on the MOU.

As the Simco Defendants explain, the "fundamental element is completely absent in this case based upon the clear deposition testimony of Mr. LaKamp that the only representation he relied upon was the alleged representation that he was making a short-term loan for the purchase of a railcar tipper." Dkt. 109, at 2. Charles LaKamp has not put forth any evidence that he justifiably relied on any misrepresentation by the Simco Defendants. For this reason, the Simco Defendants are entitled to summary judgment on Plaintiffs' fraud claim.

   b.  Representation

The Simco Defendants' argument about the existence of any representation is very similar to their argument about reliance, but here they emphasize that the LaKamps have no evidence that the Simco Defendants made *any* representation to them. CWT had no

communication of any kind with the LaKamps, and for that reason, it could not have misrepresented anything to them. By Charles LaKamp's own admission, he never had a "real" conversation with Crigler. And the only communication between Simco and the LaKamps was a letter from Charles LaKamp to Simco authorizing the use of his personal financial statement.

To this, the LaKamps respond with an alter ego theory. They argue that "facts are present to indicate that Simco is an alter ego of Crigler and DKI, and that Crigler and DKI were acting on behalf of Simco with Regard to the MOU." Dkt. 97, at 13. The Amended Complaint likewise alleges that the corporate and individual defendants are alter egos of each other. Dkt. 45, at ¶¶ 19–28. In essence, the LaKamps are asking the Court to use the veil-piercing doctrine and attribute the representation of Crigler and DKI (i.e., from the MOU) to Simco.[7] But this is not how the veil-piercing doctrine works.

Under the veil-piercing doctrine, "[m]embers of an LLC are not liable for the misconduct of the company unless it is the alter ego of the member." *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 386 (Idaho 2014). Similarly, for corporations, "[p]iercing the corporate veil imposes personal liability on otherwise protected corporate officers, directors, and shareholders for a company's wrongful acts allowing the finder of fact to ignore the corporate form." *Id.*

Here, rather than piercing the veil to make Simco's members (DKI, of which, Crigler is the CEO and President) liable for Simco's alleged wrongdoing, the LaKamps

---

[7] The LaKamps appear to concede that CWT made no representations and that there is no evidence that anyone was acting on behalf of CWT in making a representation to the LaKamps.

want Simco to be held liable for the alleged wrongdoing of one of its members. This is reverse veil-piercing. *In re Clark*, 525 B.R. 107, 125 n.55 (D. Idaho 2014) ("Ordinarily, 'piercing the corporate veil' allows a creditor of a corporation to ignore the corporate form and seek recovery from the corporation's principal(s). Reverse piercing is a method of holding a corporation liable for the debts of a shareholder." (cleaned up)). The LaKamps provide no authority to support applying a reverse veil-piercing doctrine in this context.[8]

     c.  Consequent and Proximate Injury

The Simco Defendants also argue that they are entitled to summary judgment on the fraud claim because the LaKamps have no evidence that the alleged misrepresentation had a consequent and proximate injury. In exchange for the $250,000, the LaKamps received a 2.2% interest in Simco. Charles LaKamp testified that he has no idea the worth of that 2.2% stake. Marianne LaKamp also has no idea the worth of the 2.2% interest. Simply put, the LaKamps have no evidence that receiving 2.2% interest in Simco resulted in any economic loss.

The LaKamps respond that they never received 2.2% interest in Simco. In support, they point to the final operating agreement for Simco that purportedly does not list them as members, and to the MOU that recorded the $250,000 investment but was not signed by Twelve Clans. Additionally, Charles LaKamp submitted a declaration wherein he states he has never received any documentation confirming the 2.2% interest. Dkt. 97-3. In that same

---

[8] In addition to there being no reliance, there is also a question of whether there were any representations by the Simco Defendants to the LaKamps. Because the Court is granting summary judgment on this claim for the Simco Defendants on the grounds that there is no reliance, the Court does not need to determine whether there is evidence that the Simco Defendants actually made any misrepresentations.

declaration, Charles LaKamp states:

> Before this lawsuit was filed, as I tried to get my $250K back, I was told that I would need to dissociate as a member of Simco in order to get my $250K back, so I assumed I was a member, even though later documents showed otherwise, which was and is very confusing.

*Id.* at ¶ 8.

The operating agreement fails to list the LaKamps as members, but this alone does not negate the evidence of their membership because, under Idaho law, membership is not limited to those listed in the operating agreement. *See* Idaho Code § 30-25-401. "After the formation of a limited liability company, a person becomes a member . . . [w]ith the affirmative vote or consent of all the members . . . ." *Id.* The question then is whether a factual dispute exists as to whether *all* the members of Simco consented to the LaKamps' membership. This puts the focus on Twelve Clans. Did they consent or not? There is no evidence that they signed the MOU, suggesting Twelve Clans did not consent. Conversely, the Simco Defendants all agree that LaKamps are members, suggesting Twelve Clans must have consented. Charles LaKamp even assumed the LaKamps had membership at one time.

After all the summary judgment briefs were filed, the Court, by email, requested a five-page supplemental brief from the parties addressing the lack of Twelve Clans' signature. *See* Dkt. 116, at 2 (a copy of the email's text). The Simco Defendants were the only parties who filed such a brief. Dkt. 114. They argued that Twelve Clans' consent was not necessary to create the LaKamps' interest in Simco because a *transferee* interest, as opposed to a *membership* interest, is not governed by Idaho Code § 30-25-401. DKI was transferring part of its interest to the LaKamps. However, what this argument wholly

ignores is the Simco Operating Agreement, which requires consent from the holders of at least 80% of the membership interests in order to transfer an interest. Dkt. 81-3, at 125. Twelve Clans owns over 80% membership interest. *Id.* at 128. Therefore, Twelve Clans' consent was required whether or not the LaKamps had a membership interest or were simply transferees.

Alternatively, the Simco Defendants argue that they can prove at trial that Twelve Clans consented. Concurrently with their brief, they filed a Declaration of David Greendeer, who was a member of Twelve Clans' Board of Directors in September 2019. Dkt. 115. Greendeer testifies that Twelve Clans knew of the plan for the LaKamps to purchase a portion of DKI's interest and that it consented to this purchase. *Id.* Attached to Greendeer's Declaration is email correspondence, dated September 24, 2019, between Twelve Clans' representatives and Crigler that corroborate Greendeer's testimony.

The LaKamps filed an objection to Greendeer's Declaration. Dkt. 116. They contest it on procedural grounds rather than on the merits. First, they argue that the Court's email did not direct the parties to file new evidence, and thus Greendeer's Declaration is untimely. To be sure, the email did not expressly ask for new evidence, but it did not forbid new evidence either. Second, they argue that the timing violated Local Rule 7.1(b), which requires the moving party to include its evidence with the motion. Idaho Dist. Loc. R. 7.1(b). This rule does not disallow the Court from considering subsequently filed evidence. On the contrary, Federal Rule of Civil Procedure 56(e) allows the Court to "give an opportunity [to the parties] to properly support or address [a] fact." That is what happened here. Third, the LaKamps argue that Greendeer has not been identified as a witness. That

MEMORANDUM DECISION AND ORDER - 23

is immaterial at this stage of the case. And fourth, the LaKamps argue that Greendeer's Declaration includes inadmissible hearsay, when he states, "I was advised that another party, Charles LaKamp, desired to purchase a portion of Dorfkrug International's interest in Simco Venture Fund." That statement is not being proffered for the truth of the matter asserted and may be considered.

In sum, the Court accepts Greendeer's Declaration as appropriately filed. With that evidence of Twelve Clans' consent, the LaKamps cannot raise a material dispute about whether they received an interest. As a matter of law, the Court finds that the LaKamps have a 2.2% interest in Simco.

## 2. Fraud in Inducement

The Simco Defendants lump this claim together with the first fraud claim. The LaKamps do the same, but there is an issue specific to the LaKamps' fraud in the inducement claim that will be addressed below.

## 3. Idaho Consumer Protection Act

In their Amended Complaint, the LaKamps alleged that the Simco Defendants (and other Defendants) violated Idaho Code § 48-603(2), (5), (7), (17), and (18). Under those provisions, the following methods of unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful:

> (2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> . . .
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;

. . .
(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
. . .
(17) Engaging in any act or practice that is otherwise misleading, false, or deceptive to the consumer;
(18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C, Idaho Code, provided, however, that the provisions of this subsection shall not apply to a regulated lender as that term is defined in section 28-41-301, Idaho Code.

Idaho Code § 48-603.

The Simco Defendants argue they are entitled to summary judgment as a matter of law because the transaction Charles LaKamp testified about in his deposition did not include any provision of goods or services by the Simco Defendants to the LaKamps.

In response, the LaKamps contend that the 2.2% interest is a "good" as defined in the Idaho Consumer Protection Act. Indeed, Idaho Code § 48-602(6) defines "goods" as "any property tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, including certificates or coupons exchangeable for such goods." The LaKamps argue that it is incongruous for the Simco Defendants to argue in one breath that the LaKamps did receive an interest in Simco and in the next breath argue there are no goods at issue.

The LaKamps have not provided any evidence to support the claim that the Simco Defendants engaged in unfair practices in providing an interest in Simco to the LaKamps. The deception Charles LaKamp testified to regarded the supposed loan for the railcar tipper, and none of the Simco Defendants made any representation about a railcar tipper.

Moreover, "[i]n order to have standing under the Idaho Consumer Protection Act

(ICPA), I.C. § 48-601, *et seq.*, the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively." *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010). The only contractual relationship between the LaKamps and any of the Simco Defendants is the one between the LaKamps and DKI memorialized in the MOU. The Simco Defendants contend that the MOU undisputedly shows that the LaKamps contracted with DKI to purchase a portion of DKI's interest in Simco. Thus, at a minimum, it does not appear LaKamps were in a contractual relationship with the Simco Defendants to a sufficient degree to provide standing in this context.

However, even assuming standing exists, as the Court noted, the LaKamps have not brought forth any evidence to support this claim. Summary judgment is, therefore, appropriate.

### 4. Intentional Infliction of Emotional Distress

During their oral argument, as well as in some response briefing, the LaKamps conceded that they abandoned this claim against each defendant. Dkt. 119, at 30. The Court thus determines that the LaKamps abandoned their intentional infliction of emotional distress claim against *all* parties. *See BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000) ("A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case."). For this reason, the Court will not hereafter address this claim. The Defendants are entitled to judgment in their favor on the intentional infliction of emotional distress claim.

### 5. Unjust Enrichment

MEMORANDUM DECISION AND ORDER - 26

The Simco Defendants believe they are entitled to summary judgment on all of LaKamps' claims for damages because, as before, the LaKamps cannot show any damage in light of the fact that they received a 2.2% interest in the venture. In addition, the Simco Defendants argue some of them are entitled to summary judgment on the unjust enrichment claim because *they* received nothing in value from the LaKamps. Specifically, CWT and Simco contend they did not receive any of the $250,000.

"Unjust enrichment refers to the unjust receipt of something at the expense of another." *Neill v. Minnesota Life Ins. Co.*, 2011 WL 2182573, at *8 (D. Idaho June 3, 2011). Under Idaho law, "[a] prima facie case of unjust enrichment consists of three elements: (1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such a benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Vanderford Co. v. Knudson*, 165 P.3d 261, 272 (Idaho 2007).

The undisputed facts show that neither CWT nor Simco received any benefit from the LaKamps. One hundred percent of the LaKamps' investment went to DKI for cost coverage. For that reason, CWT and Simco are entitled to summary judgment as a matter of law on this claim.

As for Crigler and DKI, they are also entitled to summary judgment on this claim as well for at least two reasons. First, the LaKamps cannot establish an unjust enrichment claim against DKI and Crigler. As explained above, DKI is the only Simco Defendant that was in a contractual relationship with the LaKamps. Under Idaho law, "when parties enter

into an express contract, a claim based in equity is not allowed because the express contract precludes enforcement of equitable claims." *Iron Eagle Dev., LLC v. Quality Design Sys., Inc.*, 65 P.3d 509, 514 (Idaho 2003). "Unjust enrichment is an equitable claim, and equitable claims will not be considered when an adequate legal remedy is available," such as a claim for fraud. *Mannos v. Moss*, 155 P.3d 1166, 1173 (Idaho 2007) (cleaned up).

Second, even if the LaKamps could bring a claim of unjust enrichment against DKI and Crigler, summary judgment would still be warranted. In this scenario, the inquiry turns on the third element of unjust enrichment: whether the LaKamps received anything in return and whether Crigler's and DKI's acceptance of the $250,000 is inequitable. From the briefing, it is clear that the LaKamps received 2.2% interest in exchange for $250,000. Regarding their interest, both Charles and Marianne LaKamp testified that they do not know the value of their stake in Simco. Despite not knowing the present worth of their investment, they LaKamps have failed to meet their burden. They have not provided any evidence that this transaction was inequitable or resulted in an economic loss. *See Turcott v. Est. of Bates*, 443 P.3d 197, 204 (Idaho 2019) (holding that "to recover damages for unjust enrichment the complaining party must establish that the equities of the case would otherwise make it unfair for the recipient of the enrichment to receive a benefit without making compensation for the value of that benefit").

### 6. Declaratory Judgment

This claim is somewhat unique. In essence, the LaKamps ask whether or not they own a 2.2% interest in Simco. The Court has already determined the LaKamps do, in fact, own said interest. *See infra,* Section IV(A)(1)(c). Accordingly, this claim need not be

addressed further.

   7.  *Federal Securities Fraud – 15 U.S.C. §§ 78j (Section 10(b) of the Exchange Act)*[9]

It is fundamental that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud cased an economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). "To prove loss causation, [plaintiffs] must demonstrate a causal connection between the deceptive acts that form the basis for the claims of securities fraud and the injury suffered by the [plaintiffs]." *Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014).

There is no evidence of any causal connection between anything the Simco Defendants did and the "short-term loan" transaction that Charles LaKamp testified about. While there is, theoretically, a connection between at least some of the Simco Defendants and the 2.2% interest transaction, Charles LaKamp did not identify that as the transaction at issue in his deposition. Therefore, the Simco Defendants are entitled to summary judgment on this claim.

   8.  *Federal Securities Fraud – Section 20(a) of the Exchange Act (15 U.S.C. § 78t)*

For the same reasons that applied to the federal securities fraud claim under 15 U.S.C. § 78j, the Simco Defendants are entitled to summary judgment on this claim.

   9.  *Federal Securities Fraud – 15 U.S.C. §§ 77l & 77q*

In addition to the causation issue that plagues the LaKamps' other federal securities

---

[9] There is some confusion about how the LaKamps labeled their Federal Securities Fraud claims. Claim 7 is labeled as arising under 15 U.S.C. §§ 78j and 78t. The first section, 15 U.S.C. § 78j, corresponds with Section 10(b) of the Securities Exchange Act. The latter section, 15 U.S.C. § 78t, corresponds with Section 20(a) of the Securities Exchange Act, which is addressed in Claim 8.

fraud claims, this particular claim also presents a statute of limitations issue.

A claim for relief under 15 U.S.C. § 77l has a one-year statute of limitations. 15 U.S.C. § 77m ("No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."

The Simco Defendants argue that the LaKamps' claim accrued no later than September 25, 2019, the day Charles LaKamp signed the MOU, and certainly no later than October 7, 2019, the date of the $200,000 wire transfer. The LaKamps argue that they only discovered the discrepancy in the early part of 2020. Even if true, the LaKamps should have known that the money was for an interest in Simco and not a loan for a railcar tipper when Charles LaKamp signed the MOU because that is what the MOU stated. Charles LaKamp admits as much in his deposition.

The LaKamps filed this lawsuit on November 30, 2020, more than one year after the events identified. Thus, the statute of limitations bars this claim, and the Simco Defendants are entitled to summary judgment.

10. *Idaho Securities Fraud*

In their Amended Complaint, the LaKamps allege the Simco Defendants violated Idaho securities law. The LaKamps originally cited Idaho Code § 30-14-301, which prohibits the sale of unregistered securities. Dkt. 45, at ¶ 212. They later cited Idaho Code § 30-14-501, which prohibits fraud in connection with the sale of a security. Dkt. 45, at ¶ 220. It appears from the allegations specific to this claim that they intended to allege a

violation of Idaho Code § 30-14-501. *See id.* at ¶¶ 213–19. However, because the LaKamps

make an argument specific to Idaho Code § 30-14-301 in their response brief to the Simco

Defendants' Motion, the Court reviews the claim as brought under that statute as well.

Whether Idaho Code § 30-14-301 or Idaho Code § 30-14-501 applies, the statute of

limitations for both is found in Idaho Code § 30-14-509(j). That statute was recently

amended. At the time this lawsuit was filed, Idaho Code § 30-14-509(j) provided:

> A person may not obtain relief:
> (1) Under subsection (b) of this section *for violation of section 30-14-301*,
> Idaho Code, or under subsection (d) or (e) of this section, unless the action is
> instituted within one (1) year after the violation occurred; or
> (2) Under subsection (b) of this section, *other than for violation of section
> 30-14-301*, Idaho Code, or under subsection (c) or (f) of this section, unless
> the action is instituted within the earlier of two (2) years after discovery of
> the facts constituting the violation or five (5) years after the violation.

Idaho Code § 30-14-509 (2021). If the LaKamps argument is viewed under § 30-14-301, a

one-year statute of limitations applies and bars this claim. If, instead, the Court reviews the

claim under § 30-14-501, then a two-year statute of limitations applies, and this claim is

not barred. For that reason, the Court examines the parties' substantive arguments as they

apply to §30-14-501.

Idaho Code § 30-14-501 provides:

> It is unlawful for a person, in connection with the offer, sale, or purchase of
> a security, directly or indirectly:
> (1) To employ a device, scheme, or artifice to defraud;
> (2) To make an untrue statement of a material fact or to omit to state a
> material fact necessary to make the statements made, in light of the
> circumstances which they were made, not misleading;
> (3) To engage in an act, practice, or course of business that operates or
> would operate as a fraud or deceit upon another person; or
> (4) To divert investor money to the personal use of the issuer, offeror or
> seller, or to pay prior investors without specifically disclosing that use

before receiving the investor's money.

The LaKamps allege that the Simco Defendants made representations and omissions about material facts with the intent to deceive and defraud. Dkt. 45, at ¶ 215.

As already explained, the Court finds no evidence of false statements about material facts from any of the Simco Defendants. While there appears to have been confusion on Mr. LaKamp's part, there was no false statement about a material fact that would preclude summary judgment on this claim.

### B. Second Motion for Summary Judgment – Malletta

The Estate of John Malletta (the "Estate") filed a Motion for Summary Judgment after Malletta died. The Estate's position with regards to summary judgment is primarily that Charles LaKamp testified in his deposition that he had never had a conversation with Malletta and, surprisingly, did not even know he was suing Malletta. Dkt. 78-1, at 43, 52.

Q: . . . Do you recall any conversations with Mr. Malletta?

A: If I didn't say hello to him in a meeting, and it would not have been a conversation at that level, I do not remember a conversation with Malletta. . . . .

Dkt. 78-1, at 43.

Malletta's Attorney: Okay. Other than the document we've been discussing, which is the memorandum of understanding, isn't it true that you have no other evidence that Mr. Malletta is liable for any of the damages you're claiming in this lawsuit?

Charles LaKamp: Personally or corporately?

Malletta's Attorney: Well, Mr. LaKamp, you sued him individually. Are you aware of that?

Charles LaKamp: Is that true?

LaKamps' Attorney: It's in the complaint.

Charles LaKamp: Okay. I am now.

Malletta's Attorney: Well, I'm glad to hear that your counsel has informed you that you sued Mr. Malletta individually.

Given that you have sued him individually, other than the memorandum of understanding, are you in possession of any other evidence which would indicate Mr. Malletta is liable for the damages you are claiming in this lawsuit?

Charles LaKamp: I'm presently unaware of any other, which doesn't mean it doesn't exist. I just don't know to be able to answer your question right now.

Dkt. 78-1, at 52.

Malletta signed the MOU as the president of IRWS, and Malletta's interest in IRWS was held by a separate entity, Timber-Canyon-MT, LLC. Dkt. 78-1, at 3. The sole connection between Malletta and the LaKamps' allegations is the mutually signed MOU. Charles LaKamp testified in his deposition that he believed Malletta's signature on the MOU meant that Malletta was conveying a personal guarantee of a loan. Dkt. 78-1, at 52.

The Amended Complaint barely references Malletta. The only substantive allegations that specifically refer to Malletta are the following:

40. IRWS was formed on or about December 12, 2018. At the time of its organization, its principal place of business was designated as 13095 North Andys Gulch, Boise, Idaho 83714, which is a single family residence—not a commercial property—believed to be the home of Malletta (at least as of December 12, 2018).
. . .
42. Malletta and non-party Jeff Thompson were the named governors of IRWS at the time of IRWS's formation.
. . .
57. Runft introduced Plaintiffs to Crigler and Malletta.

MEMORANDUM DECISION AND ORDER - 33

Dkt. 45, at ¶¶ 40, 42, 57.

The Estate argues that the LaKamps have not alleged or shown any evidence that Malletta is personally liable for any of their claims.

The Estate begins by arguing that the LaKamps have failed to show that Malletta was the alter-ego of IRWS and thus cannot sue Malletta personally for actions of IRWS.

The two primary elements to pierce the corporate veil are: (1) "a unity of interest and ownership between the corporation and the shareholder that the two no longer exist as separate entities," and (2) "failure to disregard the corporation would result in fraud or injustice." *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1111 (9th Cir. 1979).

The LaKamps have failed to allege a unity of interest and ownership between Malletta and IRWS to a sufficient degree that the two should no longer be considered separate.[10] Instead, the Amended Complaint generally alleges that the Individual Defendants and Corporate Defendants are all alter-egos because the entities were "merely shells." Dkt. 45, at ¶¶ 20–28. This general allegation is not adequate. Without proof for the Court to pierce the corporate veil, it cannot hold Malletta liable for the actions of IRWS.[11] Therefore, the Court must examine each claim alleged against Malletta only as it pertains to him and not IRWS.

---

[10] In fact, it appears Malletta does not even have a direct, personal interest in IRWS.

[11] Also, Malletta's death undermines the alter-ego theory. If IRWS is the alter ego of Malletta, then it would make sense for IRWS to have ceased operation upon Malletta's death. Instead, IRWS is the owner of the landfill and continues to operate it to this day.

### 1. Fraud

Charles LaKamp testified in his deposition that he did not have any substantive communication with Malletta—whether about a railcar tipper, the $250,000, or anything else. The Estate argues that there is no representation attributed to Malletta that can be the basis of a fraud claim. In response, the LaKamps point to the MOU in support. As has been stated before, however, Charles LaKamp testified he did not rely on the MOU. Furthermore, Malletta signed the MOU on behalf of IRWS.

Because the Court finds that Malletta did not make any representation that could be the basis of the fraud claim, the Estate is entitled to summary judgment on this claim.

### 2. Fraud in Inducement

For the same reasons that apply to the fraud claim, the Estate is entitled to summary judgment on the fraudulent inducement claim.

### 3. Idaho Consumer Protection Act

To bring a claim under the Idaho Consumer Protection Act, a plaintiff must have "purchase[d] or lease[d] goods or services," Idaho Code § 48-608(1), from a person who used "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Idaho Code § 48-603.

Malletta did not sell or lease any goods or services to the LaKamps. The LaKamps do not allege otherwise, except for their general alter-ego allegations. Furthermore, even if Malletta was an alter-ego of IRWS, the LaKamps have no evidence that IRWS sold or leased any goods to the LaKamps. Therefore, the Estate is entitled to summary judgment on this claim.

### 4. Unjust Enrichment

The LaKamps state in their response brief that they "do not intend to pursue a cause of action for unjust enrichment against Malletta." Dkt. 102, at 15. Given this, the LaKamps have clearly abandoned this claim. *See BankAmerica Pension Plan*, 206 F.3d at 826.

Even if the LaKamps did not abandon this claim, the Estate would prevail. The Estate argues that Malletta did not personally benefit from the $250,000 transaction. Indeed, there is no evidence to suggest that Malletta received any benefit. Therefore, the Estate is entitled to summary judgment on this claim.

### 5. Declaratory Judgment

The Estate argues that, at least as far as it is concerned, the declaratory judgment claim fails as a matter of law because there is no justiciable controversy between the Estate, or Malletta before his death, and the LaKamps.

"[D]eclaratory judgment actions run a particular risk of crossing the fine line between purely hypothetical or academic questions and actually justiciable cases." *Westover v. Idaho Counties Risk Mgmt. Program*, 430 P.3d 1284, 1289 (Idaho 2018).

To the extent that the declaratory judgment claim requests the Court to declare the legal relationship between the Estate and the LaKamps, the Court agrees with the Estate that there is no justiciable controversy between the parties such that declaratory judgment is appropriate.

However, it appears that the declaratory judgment claim is generally alleged in the Amended Complaint as seeking a declaration of the LaKamps' rights under the MOU. While this has nothing to do with either Malletta or his Estate, it is a justiciable controversy

as to at least some of the other parties and will be dealt with below.

6. *Federal Securities Fraud – 15 U.S.C. §§ 78j*

Much like the Estate's argument regarding the common law fraud claims, the Estate argues it is entitled to summary judgment on the securities fraud claim because Malletta made no representation to the LaKamps. A claim brought under Section 10(b) of the Exchange Act and Rule 10b-5 requires the plaintiff to prove that the defendant "ma[de] an untrue statement of a material fact," 17 C.F.R. § 240.10b-5, so when the defendant makes no statement, the defendant cannot be liable. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 138 (2011).

Again, the LaKamps argue Malletta's representation or statement was the MOU itself. But Section 10(b) of the Exchange Act also requires *reliance* on that statement. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) ("Any person or entity . . . who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities *relies* may be liable as a primary violator under 10b-5 . . . .) (emphasis added). By Charles LaKamps' own admission, the LaKamps did not rely on the MOU. The Estate is entitled to summary judgment on this claim.

7. *Federal Securities Fraud – Section 20(A) of the Exchange Act*

"In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator . . . ." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). In this context, *control* "means the possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "To establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter." *Arthur Children's Tr. v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993). It is the *defendant's* burden "to show that she acted in good faith and did not directly or indirectly induce the violations." *Howard*, 228 F.3d at 1065 (cleaned up).

The Estate's arguments seem to place that burden on the LaKamps. As the president of IRWS, Malletta *may have been* a controlling party. *See Howard*, 228 F.3d at 1065–66. And it is the Estate's burden to show that Malletta acted in good faith and did not induce the violation.

But all of this is beside the point: the LaKamps have not put forth evidence of federal security fraud because the LaKamps did not rely on any misstatement in the MOU. Therefore, Malletta could not have induced the violation for the sole reason of there not being a violation. For this reason, the Estate is entitled to summary judgment on this claim.

8.  *Federal Securities Fraud – 15 U.S.C. §§ 77l & 77q*

Unlike the other Defendants, the Estate does not raise the statute of limitations issue here. Typically, this is not something the Court can raise sua sponte. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 657 (4th Cir. 2006).

Instead, the Estate repeats the refrain: Malletta did not make an untrue statement of material fact to the LaKamps. *See* 15 U.S.C. §§ 77l & 77q (both requiring an "untrue statement of material fact"). The Court agrees. Therefore, the Estate is entitled to summary

judgment on this claim based upon the lack of any untrue statement.

### 9. *Idaho Securities Fraud*

For the same reason, the Estate is also entitled to summary judgment on the Idaho Securities Fraud claim.

## C. **Third Motion for Summary Judgment – IRWS**

In its Motion for Summary Judgment, IRWS went through each of the LaKamps' claims. Malletta's Estate joined IRWS's motion. Dkt. 88.

### 1. *Fraud*

As stated above, under Idaho common law, a plaintiff must prove the following elements to succeed with a fraud claim:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*G & M Farms*, 808 P.2d at 855.

IRWS argues the LaKamps cannot prove there was a false representation, the LaKamps' ignorance of the falsity, or the LaKamps' right to rely on the purportedly false representation.

Pointing to its Statement of Facts, IRWS tells the story of the LaKamps' investment: In August 2019, Charles LaKamp claims that he had a single meeting with Runft in which they discussed a loan to IRWS so it could purchase a railcar tipper. Dkt. 79-2, at ¶¶ 3, 6, 14. On September 9, 2019, Runft emailed Charles LaKamp, saying, "[p]revious negotiations of a larger investment at this time are acknowledged to be now terminated due

to unanticipated, intervening circumstances" and that the investment now agreed upon was for $250,000 in exchange for 1.25% equity ownership. *Id.* at ¶ 7. The following day, Charles LaKamp wired $50,000 to the Runft & Steele trust account. *Id.* at ¶ 8. On September 25, 2019, LaKamp signed the MOU, which says, "[t]he parties agree and understand that [Charles LaKamp] has invested $250,000 for a Two and Two Tenths (2.2) interest in Simco to date, of which 100% of the funds were directed to DKI for cost coverage . . . ." *Id.* at ¶ 9. That same day, Simco was formed with the Idaho Secretary of State *Id.* at ¶ 10. Charles LaKamp wired the remaining $200,000 to the Runft & Steele trust account on October 7, 2019. *Id.* at ¶ 13. As a result of the transaction, the LaKamps received an interest in Simco. *Id.* at ¶¶ 19, 22. And, importantly, Charles LaKamp was aware of that interest before this lawsuit. *Id.* at ¶¶ 23, 24.

These facts reveal a fatal flaw in the LaKamps' fraud claim: to the extent that there was any false representation about a railcar tipper loan, that was corrected before the $250,000 investment. There is no fraud when the purported falsity of a statement is revealed to the recipient before the recipient relies on the false statement. *See Faw v. Greenwood*, 613 P.2d 1338, 1340 (Idaho 1980) ("[W]hen a purchaser is given the opportunity to conduct an independent investigation of the records and does so, it is generally held that he is not entitled to rely on alleged misrepresentations of the seller."). Charles LaKamp was not ignorant of the material details leading up to the investment.

The LaKamps respond by pounding the drum about the false representations that the money was for the purchase of a railcar tipper and that the MOU included those false representations. The LaKamps also argue that they did not receive an interest in Simco.

As for the MOU, the LaKamps' argument is undercut by Charles LaKamp's signature in the MOU agreeing to its terms. The MOU described the details of the investment—none of which regarded a railcar tipper—and Charles LaKamp signed the MOU anyway. What's more, Charles LaKamp testified in his deposition that he did not rely on the MOU, so even if there were false representations in the MOU, it cannot be used as evidence of his reliance on a false representation.

And as explained above, the undisputed evidence shows that the LaKamps received the 2.2% interest in Simco. For these reasons, IRWS is entitled to summary judgment on this claim.

### 2. Fraud in Inducement

"Fraudulent inducement" is a defense to the enforcement of a contract. It is not a standalone claim.[12] For that reason alone, IRWS is entitled to summary judgment on this claim.

That said, there are additional flaws to the LaKamps' second claim. This claim centers on the MOU—specifically that the Defendants, including IRWS through its agents, fraudulently induced Charles Lamp to sign the MOU.

IRWS contends that the MOU is two things: (1) an admission of fact by Charles LaKamp that he was investing $250,000 for a 2.2% interest in Simco and that money was to go to DKI, and (2) the grant of an option to LaKamp. Neither supports a claim of fraud.

---

[12] The LaKamps cite *Budget Truck Sales, LLC v. Tilley*, 163 Idaho 841, 847, 419 P.3d 1139, 1145 (2018), which suggests that sometimes fraud in the inducement can stand alone. That said, this does not seem to relevant in this case. Moreover, given the total lack of fraud, the Court need not wade into this strand of state law further.

First and foremost, Charles LaKamp had the chance to read the MOU (which was short) before he signed it. The MOU did not reflect Charles LaKamp's belief about a loan to IRWS to finance a railcar tipper. Rather, it spoke clearly about the investment in Simco. Second, as to the option, there is no allegation that ties this to the fraud.

For all these reasons, IRWS is entitled to judgment as a matter of law on the second claim.

### 3. Idaho Consumer Protection Act

IRWS has a simple argument regarding the third claim—it did not lease or sell any goods or services to the LaKamps. Charles LaKamp negotiated an investment in a separate entity—Simco—and paid DKI for that investment. This transaction occurred in September and October 2019. Simco was not even a member of IRWS until July 24, 2020.

In response, the LaKamps point to the September 9, 2019 email, which mentions an investment in return for a 1.25% interest in the landfill project. The initial payment of $50,000 came before the MOU, so the LaKamps argue that it pertained to an investment in IRWS.

For the LaKamps to argue that the initial $50,000 was an investment in IRWS is certainly a pivot. The email does not specify that the interest would be in IRWS. The follow-up MOU clarifies that the interest is in Simco. And Charles LaKamp insisted the money was a *loan* to IRWS for a railcar tipper, which is not at all what the LaKamps now argue regarding this claim. Simply put, there is no evidence to support this claim against IRWS, so IRWS is entitled to summary judgment on this claim as well.

### 4. Unjust Enrichment

As stated above, "[a] prima facie case of unjust enrichment consists of three elements: (1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such a benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Vanderford Co.*, 165 P.3d at 272.

IRWS focuses on the first element—whether it received any benefit from the LaKamps. The answer is no. The direct recipient of the $250,000 was DKI. To be sure, DKI is a member of Simco, and Simco is a member of IRWS. But the LaKamps' payments were part of an adjustment of the LaKamps' and DKI's respective interest in Simco—i.e., the LaKamps were purchasing part of DKI's interest in Simco. The payments had nothing to do with the total contribution later made by Simco into IRWS. Accordingly, IRWS received nothing from the LaKamps.

Again, in a pivot, the LaKamps say that the first $50,000 was supposed to be an investment in IRWS. In addition to the flaws in this argument explained in the prior section, even if this was true, this does not show that IRWS *actually* received anything—only that it was *supposed* to.

Therefore, IRWS is entitled to summary judgment on this claim.

### 5. *Declaratory Judgment*

The LaKamps' sixth claim asks for declaratory judgment to determine the rights of the parties under the MOU. Dkt. 45, at ¶ 188.

IRWS contends that there are two points of undisputed material facts before the Court which illustrates summary judgment is appropriate: (1) the LaKamps have no direct

interests in IRWS; and (2) the LaKamps rights to exercise the option under the MOU have been rejected and are no longer available. The MOU specified that the LaKamps were receiving a direct interest in Simco—not IRWS. The MOU also gave the LaKamps a purchase option, but IRWS argues that the LaKamps rejected that offer when counsel for the LaKamps wrote to the Defendants that the LaKamps were formally requesting a refund of the $250,000. *See* Dkt. 45-2, at 34 (copy of letter).

The LaKamps agree that they do not have an option under the MOU, but that is only because the MOU was never effective. And, based upon their belief that the MOU never took effect, the LaKamps argue they never received the 2.2% interest in Simco, and the Court should confirm this. The LaKamps admit they do not own any IRWS interest, but argue this is only because it was fraudulently withheld from them. Here, the LaKamps are again returning to the September 9, 2019 email that mentioned a 1.25% interest.

As stated above, that email does not specify that the 1.25% interest was in IRWS. Moreover, Charles LaKamp testified in his deposition that he was extending a loan to IRWS that he believed would be paid back. He, himself, never believed he was acquiring a 1.25% interest in IRWS.

### 6. *Federal Securities Fraud – 15 U.S.C. §§ 78j*

To recover damages for violations under 15 U.SC. § 78j (section 10(b) and Rule 10b-5 of the Exchange Act), "a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John*

*Fund, Inc.*, 573 U.S. 258, 267 (2014) (cleaned up).

For the same reasons that apply to the state law fraud claim, IRWS argues that this claim fails as a matter of law because the LaKamps cannot prove reliance. Likewise, the LaKamps' arguments here about reliance are the same as their arguments regarding the state law fraud claim.

There is frankly no evidence that the LaKamps relied on a representation from IRWS that the money was to be used for a railcar tipper. Neither the September 9, 2019 email nor the MOU referred to such a transaction. To the extent that there was any conversation between Runft and Charles LaKamp about a railcar tipper, the September 9, 2019 email and the MOU clarified what the money solicited from Charles LaKamp was for: an interest in Simco. For the same reasons there is no showing of reliance for the state law fraud claim, there is no showing of reliance for this claim. Accordingly, IRWS is entitled to summary judgment on this claim.

### 7.  *Federal Securities Fraud – Section 20(A) of the Exchange Act*

Section 20(A) of the Exchange Act is codified in 15 U.S.C. § 78t. The LaKamps are alleging joint liability against IRWS for aiding and abetting securities fraud. Aiders and abettors of federal securities fraud may be *prosecuted* under 15 U.S.C. § 78t. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 158 (2008). But there is no private cause of action for aiding and abetting securities fraud. *Id.* "The § 10(b) implied right of action does not extend to aiders and abettors. The conduct of a secondary actor must satisfy each of the elements or preconditions for liability . . . ." *Id.* As stated in the previous section,

the LaKamps fail to satisfy the elements under § 10(b) of the Exchange Act.[13]

IRWS is entitled to summary judgment on this claim.

8.  *Federal Securities Fraud – 15* U.S.C. *§§ 77l & 77q*

IRWS argues that this claim is barred by the statute of limitations in 15 U.S.C. § 77m. A claim for relief under 15 U.S.C. § 77l has a one-year statute of limitations. 15 U.S.C. § 77m ("No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title . . . ."). The claim accrues "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *Id.*

The MOU was signed September 25, 2019, and Charles LaKamp wired the second installment on October 7, 2019. By that time, Charles LaKamp knew, or should have known, that the money was for an interest in Simco. This lawsuit was not filed until November 30, 2020, more than a year later. Thus, this claim is barred by the statute of limitations.

The LaKamps shift the inquiry and argue the timeframe should run from when they discovered that they did not have an interest in Simco or IRWS which was in early 2020. The problem with this is that the *only* purportedly false statement Charles LaKamp relied on was the statement about the railcar tipper. He simply did not rely on any promise about receiving an interest in Simco or IRWS.

---

[13] The LaKamps do not argue that there is a private cause of action under Section 20(A) of the Exchange Act for aiding and abetting, but rather that IRWS should be held liable for its primary acts under Section 10(b) of the Exchange Act. Thus, even if the LaKamps were correct about IRWS's liability under Section 10(b), IRWS would still be entitled to summary judgment on Claim 8 of the Amended Complaint because it is brought under Section 20(A) of the Exchange Act.

Therefore, IRWS is entitled to summary judgment on this claim.

### 9. *Idaho Securities Fraud*

Idaho Code § 30-14-501 provides:

> It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:
> (1) To employ a device, scheme, or artifice to defraud;
> (2) To make an untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances which they were made, not misleading;
> (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person; or
> (4) To divert investor money to the personal use of the issuer, offeror or seller, or to pay prior investors without specifically disclosing that use before receiving the investor's money.

There was no untrue statement about a railcar tipper that was not corrected before the MOU and the completion of the $250,000 investment. The MOU provided where the money was eventually to go—DKI.

For this reason, IRWS is entitled to summary judgment on this claim.

## D. Fourth Motion for Summary Judgment – John Runft and R&S

As a reminder, Charles LaKamp alleges that it was Runft who made the promise about the railcar tipper; Runft was an attorney at R&S; and the $250,000 was wired to an R&S trust account. In addition to the ten claims alleged against the other Defendants, the LaKamps allege two additional claims against Runft, namely attorney malpractice and breach of fiduciary duty. Those two claims are also alleged against R&S, though the other ten claims are not. Again, each claim is addressed separately below.

### 1. *Fraud*

Charles LaKamp communicated with Runft about various plans for investment in

MEMORANDUM DECISION AND ORDER - 47

the landfill project. At his deposition, Charles LaKamp testified that he spoke with Runft who was acting on behalf of IRWS. Charles LaKamp also testified that Runft represented that the $250,000 would be a loan for a railcar tipper. Runft denies any such conversation. Dkt. 80-2, at 4. That is a factual dispute. The question is only whether that dispute is material for purposes of summary judgment.

The Amended Complaint alleges fraud vis-á-vis the MOU, the $250,000, and the interest in Simco. The LaKamps have not presented evidence to show that Charles LaKamp relied on a misrepresentation by Runft about the interest in Simco. Runft was not even party to the MOU. The LaKamps argue that Runft made misrepresentations about an investment in *IRWS*, not Simco, in connection to a railcar tipper. Even if the LaKamps had evidence of such misrepresentations of an IRWS investment, that is not the fraud they alleged in the Amended Complaint. Therefore, Runft is entitled to summary judgment on this claim.

### 2. Fraud in Inducement

For the same reasons that apply to the fraud claim, Runft is entitled to summary judgment on this claim.

### 3. Idaho Consumer Protection Act

Runft did not sell or lease any goods or services to the LaKamps. Once again, the LaKamps try to switch the focus to Runft's role in an IRWS investment. But the evidence is clear that the investment was in Simco, and the Amended Complaint only alleges that the money was an investment in Simco.

Moreover, Runft was not involved with the MOU or its terms. Dkt. 80-2, at 5. He

did not prepare or review the MOU. *Id.* He only saw the MOU after it was signed. *Id.* The LaKamps offer no evidence to the contrary.

The LaKamps have failed to show there is a material dispute of fact, so Runft is entitled to summary judgment on this claim.

### 4. Unjust Enrichment

The LaKamps argue that Runft received the benefits from the $250,000 investment. Indeed, their Statement of Disputed Facts states that Runft received distributions from that $250,000 in the form of direct cash payments and in the form of an investment in an unrelated project. Dkt. 79-1, at 12; Dkt. 81-3, at 113, 115 (Crigler's deposition testimony).

To succeed on this claim, the LaKamps must show evidence that: "(1) there was a benefit conferred *upon the defendant by the plaintiff*; (2) appreciation by the defendant of such a benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Vanderford Co.*, 165 P.3d at 272 (emphasis added).

The $250,000 went into the R&S trust account for the benefit of DKI and not for the benefit of Runft. DKI may have thereafter used some of that money to pay Runft, but that does not make Runft liable for unjust enrichment. The LaKamps are essentially arguing that they conferred a benefit on DKI, which then conferred a benefit on Runft, and that they can now recover from Runft. The Idaho Supreme Court has rejected such a theory of unjust enrichment. *See Stevenson v. Windermere Real Estate/Capital Grp., Inc.*, 275 P.3d 839, 827–29 (Idaho 2012). The evidence shows that DKI—and not the Plaintiffs— conferred a benefit on Runft. As such, Runft cannot be held liable for unjust enrichment

and is entitled to summary judgment on this claim.

### 5. *Declaratory Judgment*

Runft argues that this claim must be dismissed as against him since he is not a party to the MOU. The LaKamps make no argument in response. Summary judgment is appropriate.

### 6. *Federal Securities Fraud – 15 U.S.C. §§ 78j*

Runft argues that this claim must be dismissed because he did not have any involvement with the MOU and was not even aware of the MOU or its terms until after Charles LaKamp signed the document.

A private claim under this statute requires, among other things, that the plaintiffs relied on a misrepresentation of the defendant. *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157.

While Charles LaKamp testified that Runft made misrepresentations about a railcar tipper, there is no evidence that Runft made any misrepresentation relating to the MOU and/or any investment in Simco. Therefore, Runft is entitled to summary judgment on this claim.

### 7. *Federal Securities Fraud – Section 20(A) of the Exchange Act*

The LaKamps have not shown any evidence to support "controlling person" liability under Section 20(a). *See Howard*, 228 F.3d at 1065 ("In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator . . . ."); *see also* 17 C.F.R. § 230.405 (definition of "control"). Therefore, Runft is

entitled to summary judgment on this claim.

### 8. *Federal Securities Fraud – 15 U.S.C. §§ 77l & 77q*

Unlike most of the other Defendants, Runft does not raise the statute of limitations issue here. Again, this is not something the Court can raise sua sponte. *Eriline Co. S.A.*, 440 F.3d at 657.

Instead, Runft falls back on his general argument in defense of the fraud claims: the LaKamps have failed to show that Runft made an untrue statement of material fact to the LaKamps. *See 15 U.S.C. §§ 77l & 77q* (both requiring an "untrue statement of material fact"). The Court agrees. While there is a dispute about whether there was an untrue statement about a railcar tipper, such a statement is immaterial to the MOU and the investment in Simco. Runft is entitled to summary judgment on this claim.

### 9. *Idaho Securities Fraud*

As noted previously, the LaKamps cite both Idaho Code § 30-14-301 and § 30-14-501 in support of this claim. Dkt. 100, at 6–7. And, as outlined in regard to Simco's Motion for Summary Judgment, § 30-14-301 is barred by the statute of limitations—and/or appears to be a typo in the Amended Complaint. The pertinent sub-section is 501.

Idaho Code § 30-14-501 states:

> It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:
> (1) To employ a device, scheme, or artifice to defraud;
> (2) To make an untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances which they were made, not misleading;
> (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person; or

MEMORANDUM DECISION AND ORDER - 51

(4) To divert investor money to the personal use of the issuer, offeror or seller, or to pay prior investors without specifically disclosing that use before receiving the investor's money.

Once again, there is no evidence of Runft making an untrue statement of material fact. The LaKamps also emphasize subsection (4) in their response brief. However, there is no evidence that Runft was the issuer, offer, or seller of the Simco interest. Therefore, Runft is entitled to summary judgment on this claim.

### 10. *Professional Negligence – Attorney Malpractice*

The LaKamps bring this claim solely against Runft and R&S. Runft and R&S begin their argument by pointing to the flaws in the Amended Complaint. There, the LaKamps allege that in September 2019, Runft introduced R&S to them and that "[o]n or about September 18, 2019, Plaintiffs and R&S entered into an 'Engagement Letter for Legal Services' for the *unrelated* 'Purchase of 16375 N. Merchant Way, Nampa Idaho 83687." Dkt. 45, at ¶¶ 222–24. Runft did not represent the LaKamps regarding this purchase; instead, R&S attorney Jon Steele represented the LaKamps. *Id.* at ¶ 54; *see also* Dkt. 45-2, at 1–5 (copy of Engagement Letter). The LaKamps then allege that Runft and R&S were professionally negligent because of a conflict posed by R&S's representation regarding the Nampa property and Runft's involvement with the investment offers. Dkt. 45, at ¶¶ 225–35. Notably absent from the LaKamps' Amended Complaint is any allegation that Runft or R&S represented the LaKamps with respect to the MOU or the $250,000 transaction.

Legal malpractice claims require privity: an attorney-client relationship between the plaintiff and the defendant. *Taylor v. McNichols*, 243 P.3d 642, 661 (Idaho 2010). That relationship must be direct. *Id.* "As a general rule, no attorney-client relationship exists

absent assent by both putative client and attorney." *Berry v. McFarland*, 278 P.3d 407, 411 (Idaho 2012). "If the attorney agrees to provide assistance, or engages in conduct that could be reasonably construed as so agreeing, then there is an attorney-client relationship." *Id.* This includes both a subjective and an objective component—i.e., whether the client subjectively believed the attorney had agreed to the relationship and whether the attorney's conduct could objectively and reasonably be construed as an agreement. *H-D Transport v. Pogue*, 374 P.3d 591, 596 (Idaho 2016). "The scope of the representation depends upon what the attorney has agreed to do." *Berry*, 278 at 411. For instance, "[i]f the attorney agrees to undertake a specific matter, the relationship terminates when that matter has been resolved." *Id.*

The LaKamps allege no professional negligence relating to the Nampa property purchase, and they also do not allege an attorney-client relationship relating to the $250,000 transaction. An attorney malpractice claim requires both an attorney-client relationship and professional negligence. The Nampa property scenario has the element of an attorney-client relationship, and the $250,000 transaction scenario has an allegation of professional negligence. Neither scenario, however, has both requirements.

In their brief, the LaKamps backpedal from their Amended Complaint and argue that there was an attorney-client relationship relating to the $250,000 transaction. They come in armed with an expert witness, Benjamin Cover, who points to the email communications between Runft and Charles LaKamp and to the R&S trust account as facts supporting the conclusion of a reasonable belief that Runft and R&S had agreed to

represent the LaKamps regarding the $250,000 transaction.[14]

But the fundamental problem with this argument by the LaKamps and the expert witness's report is Charles LaKamp's own testimony during his deposition. Therein, Charles LaKamp kiboshed any argument that he subjectively believed Runft and R&S were representing him for the $250,000 transaction. He clearly stated that he communicated with Runft, believing Runft was acting on behalf of IRWS and not as the LaKamps' attorney. Charles LaKamp also characterized the $250,000 transaction as a *short-term loan* to Runft and IRWS and not as an investment brokered by his attorney. As for the R&S trust account, Charles LaKamp testified that the "point of [the] trust account" was to get his money back from Runft, the loanee. Dkt. 82, at 38–39.

The LaKamps fail to show any evidence of their subjective belief that Runft and R&S had agreed to represent them for the $250,000 transaction. For their part, Runft and R&S do show that they never actually agreed to do so—there was no engagement letter relating to the transaction, nothing indicating an indefinite representation of the LaKamps, Runft did not prepare or review the MOU prior to its signing, and Runft was not acting as an attorney in his relationship to the landfill project. Because the LaKamps fail to show evidence of agreement by Runft or their reasonable belief that Runft had agreed to representation, Runft and R&S are entitled to summary judgment on this claim.

11. *Breach of Fiduciary Duty*

---

[14] Cover's declaration and report are filed in support of Plaintiffs' Motion for Leave to Amend Complaint to Seek Punitive Damages. Dkt. 82. But the LaKamps cite the report in their response to this motion for summary judgment. Dkt. 100, at 15–19.

This claim is also alleged solely against Runft and R&S. Like the claim for attorney malpractice, this claim is predicated on there being an attorney-client relationship between the LaKamps and Runft and R&S regarding the $250,000 transaction. There being no evidence of any such relationship, Runft and R&S are entitled to summary judgment on this claim.

## V. LAKAMPS' MOTION FOR SUMMARY JUDGMENT

CWT and Simco filed a Counterclaim against the LaKamps on July 19, 2021. Dkt. 48. In the Counterclaim, Count One is a claim for intentional interference with contract (on behalf of CWT); Count Two is a claim for intentional interference with prospective economic gain (on behalf of CWT and Simco); and Count Three is a claim for breach of fiduciary duty (on behalf of Simco). The LaKamps filed a Motion for Summary Judgment addressing all three of the claims. Dkt. 81.

The claims against the LaKamps relate to the Idaho Waste lawsuit, in particular the communications between the LaKamps' attorney, JD Sullivan, and Idaho Waste's attorney, William Ghioroso. CWT and Simco allege the LaKamps were aware of the agreement CWT had to purchase the landfill from Idaho Waste and that CWT intended to thereafter sell the landfill to IRWS, whose majority member was to be Simco post-closing. Dkt. 48, at 18–19. CWT and Simco also allege the LaKamps were aware that Idaho Waste was not performing under the contract and that CWT was going to sue Idaho Waste for specific performance. *Id.* at 19. That lawsuit was filed on January 28, 2020. *Id.* Subsequently, the LaKamps, through their attorney, contacted Idaho Waste and shared information detrimental to CWT. *Id.* Notwithstanding, the Idaho Waste lawsuit was eventually

resolved, and the landfill transaction closed. *Id.* at 20.

### 1. Potential Hearsay Issue

In their reply brief, the LaKamps argue the evidence CWT and Simco rely on is inadmissible hearsay and, therefore, cannot be considered for purposes of opposing summary judgment.[15] The evidence at issue comes in the form of two declarations—one from John Tulac and the other from Runft. Those two declarations tell the following story:

CWT contracted to purchase the landfill from Idaho Waste in 2019. Dkt. 96-3, at 2. CWT and Idaho Waste had a fraught relationship, and Idaho Waste refused to perform. *Id.* During the contract negotiations and during the dispute about Idaho Waste's nonperformance, attorney William Ghiorso represented Idaho Waste. *Id.* In January 2020, CWT sued Idaho Waste for specific performance of the purchase agreement. *Id.* CWT believed that Idaho Waste's positions in that lawsuit were meritless. *Id.* at 2–3. After the state court denied Idaho Waste's motion to compel CWT to place the entire purchase price in escrow, CWT and Idaho Waste entered into a stipulated settlement agreement on March 13, 2020 (the "March Settlement"). *Id.* at 3. The March Settlement "incorporated the terms of the parties' underlying purchase and sale agreement, and effectively set a new closing date." *Id.* Additionally, the March Settlement "contained new representations that [Idaho

---

[15] While the Court *typically* sees these issues come up via a motion to strike, a specific motion is not required. The advisory committee's notes to the most recent amendments to Rule 56 provide that a Rule 56(c)(2) objection "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form *that is anticipated. There is no need to make a separate motion to strike.*" Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendment (emphasis added). Motions to strike are limited to pleadings, which are defined by Federal Rule 7(a); affidavits and exhibits filed in support of, or in opposition to, a motion for summary judgment are not pleadings. *See Albertson v. Fremont Cnty., Idaho*, 834 F. Supp. 2d 1117, 1123 n.3 (D. Idaho 2011).

Waste] would actually perform its obligations under the purchase and sale agreement which would facilitate closing." *Id.*

Despite the March Settlement, Idaho Waste continued to not perform, and CWT indicated it would press forward with the lawsuit and set aside the March Settlement because of fraudulent inducement. *Id.* at 4. The state court set an expedited evidentiary hearing for June 26, 2020. *Id.* Not long before the hearing, CWT received information that a "project stakeholder"—later identified as the LaKamps—was planning to sue CWT and IRWS. *Id.* The LaKamps, acting through their attorney J.D. Sullivan, had reached out to Idaho Waste's attorney Ghiorso and told him about their plans for a lawsuit against CWT and IRWS. *Id.* at 5.

To facilitate the landfill acquisition, CWT had a commercial lender, Columbia State Bank. Because that lender had an aversion to projects tied up in litigation, the threat of LaKamps' lawsuit put pressure on CWT to close on the acquisition as soon as possible. *See id.* at 4–5. To make matters worse, CWT's adversary, Idaho Waste, knew of that pressure because the LaKamps had told them about the impending lawsuit. *See id.* at 5. CWT negotiated with CWT for an Addendum to the March Settlement, and that Addendum was signed on June 25, 2020. *Id.* at 5–6, 17–19. The agreement reached in the Addendum included CWT foregoing a downward adjustment in excess of $250,000, an actual increase in purchase price of $305,000, and CWT foregoing any claim for attorney fees or sanctions in the Idaho Waste lawsuit. *Id.* at 6.

CWT and Simco argue that these facts support their claims for intentional interference with contract, intentional interference with prospective gain, and breach of

fiduciary duty. The problem, however, is that they are based on statements made by Ghiorso to Runft and later conveyed to Tulac. The LaKamps argue that these statements are inadmissible hearsay.

Since there are multiple statements involved, the Court delineates them to provide clarity in its later discussion. First, the LaKamps, through their attorney Sullivan, told Idaho Waste's attorney Ghiorso that they intended to sue CWT and Simco. This statement is not hearsay because it is a party-opponent statement. Fed. R. Evid. 801.[16] Second, Ghiorso told Runft what the LaKamps had told him. Runft's report of what Ghiorso told him is hearsay, and no hearsay exception is readily apparent. Third, Runft told Tulac about the Ghiorso conversation, and then Tulac testified to that in his declaration. This is another hearsay layer, and again no hearsay exception is readily apparent. Still, although Runft's and Tulac's statements seem to be inadmissible hearsay, as will be explained, the underlying facts in both declarations will be admissible at trial, especially given the high likelihood that Ghiorso will testify. *See* <u>Catrett v. Johns-Manville Sales Corp.</u>, 826 F.2d 33, 37 (D.C. Cir. 1987).

Rule 56(c)(2) states, "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). And Rule 56(c)(4) states, "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters

---

[16] Additionally, it does not appear the statement is being used for the truth of the matter—i.e., that the LaKamps were indeed planning to sue CWT and Simco.

stated." Federal Rule of Civil Procedure 56 makes clear that only admissible evidence may be considered in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c); *see also Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). However, in determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003); *AT&T Corp. v. MRO Commc'ns, Inc.*, 205 F.3d 1350 (Table), 1999 WL 1178965, at *1 (9th Cir. 1999) ("Although the facts underlying a declaration introduced in support of a motion for summary judgment must be of a type that would be admissible as evidence, the declaration itself does not have to be in a form that would be admissible at trial."). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment. *Id.* "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form *that is anticipated.*" Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendment (emphasis added).

Here, Runft and Tulac use boilerplate language indicating that their statements were made based on personal knowledge. And while these statements seem to be hearsay, with no readily apparent exception, when woven together with Sullivan's nonhearsay statement, the totality of the circumstances suggests that the form they will be presented in during trial is admissible. Moreover, Sullivan's statements alone seem to form a sufficient basis for the counterclaims. Because of this, a genuine dispute of material fact exists, and as such, summary judgment wouldn't be appropriate, as will be explained below.

In short, the challenged statements can be used at the summary judgment stage and are sufficient to create an issue of material fact that defeats summary judgment.

### 2. Intentional Interference with Contract

This claim is brought by CWT.

"Tortious interference with contract has four elements: (1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Bybee v. Isaac*, 178 P.3d 616, 624 (Idaho 2007).

In their Motion for Summary Judgment, the LaKamps argue that CWT fails to allege that the interference caused a breach, that CWT cannot show causation, and that CWT cannot show injury.

In the Counterclaim, CWT states that the landfill transaction was closed. Dkt. 48, at 20. The LaKamps argue that this is a fatal flaw to CWT's claim: if the contract was satisfied, then there was no breach. The Court agrees.

Additionally, the LaKamps argue that even if the claim was properly alleged, then CWT still does not have admissible evidence showing that the LaKamps encouraged Idaho Waste to breach the contract. The LaKamps point to Runft's deposition in which he testified about the fraught relationship between CWT and Idaho Waste that preceded the LaKamps' involvement. CWT and Idaho Waste initially signed the landfill transaction contract on January 17, 2019, with an addendum made on July 29, 2019. A couple of months later, the LaKamps invested $250,000. Then in January 2020, CWT sued Idaho Waste. Runft testified that the problems between CWT and Idaho Waste were "endemic"

and "accompanied this transaction all the way through." Dkt. 81-4, at 9. The Counterclaim alleges that the communications between Idaho Waste and the LaKamps occurred *after* the lawsuit was initiated and thus after Idaho Waste's refusal to perform. Dkt. 48, at 19. Indeed, the evidence from discovery shows that the first conversation between Sullivan and Ghiorso took place on May 29, 2020. For the same reasons that apply to the causation issue, the Court finds that CWT also cannot show evidence of injury.

Because CWT has failed to establish breach or causation, the Court finds that the LaKamps are entitled to summary judgment on this claim.

### 3.  Intentional Interference with Prospective Gain

This claim is brought by CWT and Simco.

"A plaintiff, in order to establish a *prima facie* case, must show that any claimed intentional interference with a prospective economic advantage resulting in injury to the plaintiff is wrongful by some measure beyond the fact of the interference itself." *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 861 (Idaho 1991) (cleaned up). Wrongful interference "may be shown by proof that either: (1) the defendant had an improper objective or purpose to harm the plaintiff; or (2) the defendant used a wrongful means to cause injury to the prospective business relationship." *Id.*

The arguments here are the same as the arguments regarding the claim for intentional interference with a contract. Therefore, based on the analysis above, the Court finds that there is a material dispute of fact on whether the LaKamps' communications caused an injury. Therefore, summary judgment on this claim is, likewise, improper.

### 4.  Breach of Fiduciary Duty

This claim is brought by Simco.

"To establish a claim for breach of fiduciary duty, plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached." *Tolley v. THI Co.*, 92 P.3d 503, 511 (Idaho 2004). Simco alleges that the LaKamps owed Simco a fiduciary duty because of their membership in Simco. Idaho Code § 30-25-409(a) provides that "[a] member of a member-managed limited liability company owes to the company and . . . the other members the duties of loyalty and care." Additionally, members have a duty "consistent[] with the contractual obligation of good faith and fair dealing." Idaho Code § 30-25-409(d). "Generally, whether a fiduciary has breached his duty is a question of fact." *Bushi v. Sage Health Care, PLLC*, 203 P.3d 694, 699 (Idaho 2009).

The LaKamps argue that they are not members of Simco and so do not owe any duties to Simco. Additionally, the LaKamps argue that there is no admissible evidence of wrongful communications between the LaKamps and Idaho Waste that harmed Simco.

The first of these contentions has already been resolved in Simco's favor—the LaKamps were members of Simco at the time Sullivan talked to Ghiorso. The second contention has also been resolved in Simco's favor—there is a material dispute of fact whether the communication harmed Simco, and there is admissible evidence of that communication. Therefore, the LaKamps are not entitled to summary judgment on this claim.

## VI. MOTION TO AMEND PLEADINGS TO AMEND PUNITIVE DAMAGES

Also pending before the Court is the Plaintiffs' Motion to Amend Pleadings to Add Punitive Damages. Dkt. 77. Because the Court is granting summary judgment on all of the

Plaintiffs' claims, this Motion is DENIED as MOOT.

## VII. MOTION TO SUPPLEMENT RECORD

On November 4, 2022, sixty-three days after the Court heard oral argument on the motions for summary judgment, the LaKamps filed a Motion to Supplement their responses to the Defendants' motions for summary judgment with information contained in the continued deposition of Defendant John Crigler. Dkt. 122. The LaKamps argue that there is good cause to allow the requested supplementation. *Id.* at 3. They further argue that the testimony in the continued deposition will defeat Defendants' motions for judgment and raise questions of fact for trial. Dkt. 122-1, at 9. Each of the Defendants filed a response, and in each, every Defendant argues that good cause does not exist and the deposition does not raise any material question of fact to thwart their motions. The Court agrees.

The LaKamps point to their good faith efforts to complete the deposition to establish good cause. They argue that they repeatedly attempted to schedule the continued deposition to no avail, painting the picture that the parties' schedules were as two ships passing in the night. On the other hand, the late hour in which the deposition was finally finished paints a different picture entirely. Crigler was initially deposed in May, but the deposition wasn't completed until five months later. Additionally, before the continued deposition on October 24, 2022, Crigler had already been deposed for several hours, both in his individual capacity and as a Rule 30(b)(6) designee of other Defendants. Dkt. 125, at 3. During oral argument, it was suggested Crigler's individual deposition had already been between five and a half or six hours long, which is just shy of the limit of seven hours on one day in Federal Rule of Civil Procedure 30(d)(1). That said, during the oral argument, it was

suggested that, during the initial deposition, the parties agreed to continue the deposition at a later date. Still, as the Court noted during the hearing, it was thrown off that Crigler's deposition still needed to be finished so late in the game. While it is true that the LaKamps changed counsel during this case, that alone does not explain the delay in finishing Crigler's deposition. If the information in the continued deposition is critical to defeating the Defendants' motions, as the LaKamps suggest, one must wonder why motions to continue or extend were not filed. Plaintiffs have failed to establish any cause supporting their request to deviate from the timing requirements of Rule 56, let alone the good cause expressly mandated by Local Rule 6.1(a).

Beyond the motion's dilatory nature, after carefully reviewing Crigler's continued deposition, the Court finds that the new testimony would not change the outcome. The Court finds the additional deposition testimony does not raise any material questions of fact precluding summary judgment, so supplementation is futile. The Court, therefore, DENIES the LaKamps' Motion to Supplement.

## VIII. CONCLUSION

There is no shortage of nefariousness alleged in the Amended Complaint. A hard-working, elderly[17] couple entrusts an old friend[18] with $250,000. That old friend is a smooth-talking lawyer[19] who convinces them to invest their retirement funds[20] into a new business. So the couple refinances their family home[21] and gets a loan from another

---

[17] Dkt. 45, at ¶ 168.
[18] Dkt. 45, at ¶ 51.
[19] *See* Dkt. 45, at ¶¶ 52–57.
[20] Dkt. 45, at ¶ 175.
[21] Dkt. 45, at ¶ 83.

friend,[22] and then hand over $250,000. In return, the couple gets a copy of a Memorandum of Understanding that says they now own 2.2% membership in a company, and it is signed by the presidents of two companies. But the couple never actually receive the 2.2% interest. Their money is gone.

The evidence tells a different story. The "old friend" was a stranger.[23] The $250,000 was a sliver of the couple's fortune[24] and did not come from a home refinance.[25] The husband did not seem to know whether he was loaning money or investing money,[26] and the wife did not know what the husband was up to at all.[27] The husband signed the Memorandum of Understanding without reading it[28]—or many of the emails that preceded it.[29] And most importantly, the couple does own 2.2% interest in the company.

Because of the disparity between the allegations and the facts, the Defendants are all entitled to summary judgment. There was no fraud because there was no reliance. And there are no damages because the LaKamps received what they paid for—membership in Simco.

Despite that membership in Simco, the LaKamps, through their attorney, contacted Simco's litigation opponent and provided information that may have harmed Simco and CWT. Therefore, the LaKamps are not entitled to summary judgment on the counterclaims.

---

[22] Dkt. 45, at ¶ 72.
[23] Dkt. 80-2, at 3.
[24] Dkt. 78-2, at 18 ("[I]n 2019 Plaintiffs' net worth was greater than $34,000,000.").
[25] Dkt. 78-2, at 18, 106.
[26] *See* Dkt. 80-2, at 4.
[27] Dkt. 78-2, at 106.
[28] *See* Dkt. 76-3, at 49.
[29] Dkt. 76-3, at 43–44.

## VIII. ORDER

The Court HEREBY ORDERS:

1. Defendants CWT, Crigler, DKI, and Simco's Motion for Summary Judgment (Dkt. 76) is GRANTED.

2. The Estate of John Malletta's Motion for Summary Judgment (Dkt. 78) is GRANTED.

3. Defendant IRWS's Motion for Summary Judgment (Dkt. 79) is GRANTED.

4. Defendants John Runft and Runft & Steele Law Offices, PLLC's Motion for Summary Judgment (Dkt. 80) is GRANTED.

5. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58 relating to the primary claims in this case.

6. LaKamps' Motion for Summary Judgment (Dkt. 81) is GRANTED in PART and DENIED in PART.

7. The Court will set a telephonic scheduling conference at its earliest convenience to select a trial date on the remaining counterclaims.

8. LaKamps' Motion to Amend Pleadings to Add Punitive Damages (Dkt. 77) is DENIED as MOOT.

9. LaKamps' Motion to Supplement (Dkt. 122) is DENIED.

DATED: March 1, 2023

David C. Nye
Chief U.S. District Court Judge